**VERIZON TELEPHONE
COMPANIES, et al.,
Petitioners,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.**

Sprint Corporation, et al., Intervenor.

No. 00–1207.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 6, 2001.

Decided Nov. 9, 2001.

Aaron M. Panner argued the cause for petitioners and supporting intervenors. With him on the briefs were Michael K. Kellogg, Michael E. Glover, John M. Goodman, James D. Ellis, Roger K. Toppins, Jeffry A. Brueggeman, Jay C. Keithley, and Michael B. Fingerhut.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were Daniel M. Armstrong, Associate General Counsel, Laurel R. Bergold and Lisa E. Boehley, Counsel, John M. Nannes, Acting Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys. Christopher J. Wright, General Counsel, Federal Communications Commission, and Lisa S. Gelb, Counsel, entered appearances.

Michael J. Thompson, Albert H. Kramer, Katherine J. Henry, and Andrew J. Phillips were on the joint brief of intervenors ABTEL Communications, Inc., et al. Robert F. Aldrich entered an appearance.

Michael E. Glover, John M. Goodman, James D. Ellis, Roger K. Toppins, Jeffry A. Brueggeman, Michael K. Kellogg, Aaron M. Panner, Jay C. Keithley, and Michael B. Fingerhut were on the brief of Local Exchange Carrier intervenors.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

A group of local phone companies (known as "local exchange carriers," or "LECs") seek review of an order of the Federal Communications Commission ("FCC" or "Commission") holding them liable for violating the unreasonable charge provisions of 47 U.S.C. § 201(b) (1994). The violations occurred when the LECs wrongfully imposed so-called End User Common Line ("EUCL") fees on certain "independent payphone providers" ("IPPs"). In an agency adjudication that addressed complaints challenging the fees, the FCC initially construed the rules enunciated in an earlier rulemaking, *In re MTS and WATS Market Structure*, 97 F.C.C.2d 682, 1983 WL 183026 (1983) (*"Access Charge Reconsideration"*) (setting rules by which LECs could recover costs associated with calls made on payphones), to allow the imposition of the fees. However, the FCC's decision did not survive judicial review. In *C.F. Communications Corp. v. FCC*, 128 F.3d 735 (D.C.Cir.1997), the court held that the *Access Charge Reconsideration* did not allow for the fees. The case was remanded, leading the Commission to reverse itself in the order now under review. *See In re C.F. Communications Corp. v. Century Tel. of Wisconsin, Inc.*, 15 F.C.C.R. 8759, 2000 WL 374484 (2000) (*"Liability Order"*). In changing its position following judicial review, the FCC conclusively determined

that the LECs had violated the applicable *Access Charge Reconsideration* rules by imposing the EUCL charges; the Commission decided, however, that the question of what damages should flow from that violation was best reserved for another day.

In their present petition, the LECs contend, first, that the *Liability Order* is final, and thus immediately reviewable by this court. Second, they argue that the agency may not now sanction them for conduct that had been expressly approved, and may have even been compelled, by the Commission itself. The FCC responds that we lack jurisdiction at this time, because by leaving the issue of damages unresolved, the *Liability Order* was rendered non-final. Moreover, the Commission asserts that even if we do reach the merits, the LECs' retroactivity argument must fail, as whatever reliance those carriers placed on ultimately erroneous FCC pronouncements cannot excuse their violations of governing law – as that law is *properly* construed. We conclude that the *Liability Order* is final, and that we therefore have jurisdiction to review it. It is true that the general rule is that an adjudicatory decision resolving only liability and not damages is *not* final. In this case, however, the relevant jurisdiction-conferring statute, 47 U.S.C. § 208(b), provides that an order "concluding an investigation ... of the lawfulness of a charge" is a final order subject to immediate appeal. We are presented with just such an order here.

On the merits, we hold that it was appropriate for the FCC to find the LECs liable for their EUCL charges, even though the Commission initially construed the *Access Charge Reconsideration* rules to allow the charges. We do not believe that the Commission should be prevented from stating the law correctly merely be-

cause it may have misconstrued the applicable rules in the past. We emphasize, however, that this holding does not necessarily doom the LECs' retroactivity arguments. Because the FCC has not yet fixed the means by which it will calculate damages, the LECs are not foreclosed from presenting their equitable concerns to the agency during the next phase of the proceedings. We therefore express no opinion as to the Commission's authority to impose damages on the LECs for charges that they may have collected in reliance on the agency's initial (and mistaken) interpretations of the *Access Charge Reconsideration* rules.

## I. BACKGROUND

Much of the regulatory and procedural background to the present petition is set out in *C.F. Communications. See* 128 F.3d at 736–38. We will not repeat that entire discussion here, but rather will concentrate on the most salient points. The underlying issue in this case is how local phone companies are to recover the costs that they incur when long-distance calls are made on coin-operated telephones. The story begins in 1983, when the FCC issued general rules establishing a regulatory mechanism for LECs to be compensated for providing long-distance carriers (known as "interexchange carriers" or "IXCs") access to their local networks. *In re MTS and WATS Market Structure, Third Report and Order,* 93 F.C.C.2d 241, 1983 WL 183053 (1983) ("*Access Charge Rulemaking*"), *modified on recon.,* 97 F.C.C.2d 682, 1983 WL 183026 (1983), *modified on further recon.,* 97 F.C.C.2d 834 (1984), *aff'd and remanded in part sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095 (D.C.Cir. 1984). For most phones, the Commission decided that these costs were to be footed by "end users" who would be assessed EUCL charges by the LECs. Pay telephones, however, which tend to have no predetermined end-user, required a different solution. Accordingly, the FCC decided to exempt public payphones from EUCL fees altogether, instead allowing the LECs to recover their costs from the IXCs directly, in the form of Carrier Common Line ("CCL") charges. *See Access Charge Reconsideration* at 705. Not *all* payphones were exempted, however. Instead, the FCC distinguished between true "public" payphones – such as those in airports and on street corners – and those which it labeled "semi-public" – a category that included coin-operated phones found in restaurants and gas stations, where "there is a combination of general public and specific customer need for the service." *Id.* at 704 & n. 40. Reasoning that this latter class could be linked to identifiable subscribers, the Commission allowed the LECs to impose flat EUCL charges on those subscribers, just as they would do for ordinary private phones. *See id.* at 706.

At the time when the *Access Charge Reconsideration* was issued, all of the nation's payphones were owned by the LECs themselves. This situation was soon undermined when the FCC allowed a group of "independent" providers to enter the payphone market. *See Registration of Coin Operated Telephones,* 49 Fed.Reg. 27,763 (July 6, 1984). These IPPs brought with them a technological advantage: so-called "smart" phones, which connected to ordinary phone lines rather than to the special coin lines that linked the LEC-owned phones to the central processors that supervise their calls. The new phones, which were able to perform this managerial task internally, needed no such specialized hookup. However, despite their architectural and cognitive differences, the two types of phones are found in the same kinds of places and are basically indistinguishable from the lay user's perspective. Nevertheless, when it came to

EUCL charges, the LECs decided to treat the smart phones rather differently from their less sophisticated cousins. Acting at first without any guidance from the Commission other than the original *Access Charge Reconsideration*, the LECs imposed EUCL fees on *all* of the new phones – not merely those located in semi-public places – and assessed these tolls on the IPPs directly.

Unsurprisingly, the IPPs balked at these charges. Their concerns, however, were not well received by officials at the FCC. In 1988 and 1989, informal complaints filed by two IPPs generated two letters from Anita J. Thomas, an analyst in the Enforcement Division of the Commission's Common Carrier Bureau. In both of these letters, Thomas declared that by imposing EUCL fees on IPPs, the LECs violated neither their own tariffs nor the agency's regulations. *See* Letter from Anita J. Thomas to LeRoy A. Manke, Manager, Coon Valley Farmers Telephone Co. (Apr. 4, 1989), *reprinted in* Joint Appendix ("J.A.") 154; Letter from Anita J. Thomas to Lance C. Norris, Vice President, American Payphones, Inc. (Sept. 14, 1988), *reprinted in* J.A. 152. In May of 1989, another IPP, C.F. Communications Corp. ("CFC"), filed a formal complaint, alleging that the LECs' conduct had violated various provisions of the Communications Act and seeking reparations for the wrongfully collected EUCL charges. This challenge proved unsuccessful at the agency level, as both the Common Carrier Bureau and ultimately the Commission itself sided with the LECs. *In re C.F. Communications Corp. v. Century Tel. of Wisconsin*, 8 F.C.C.R. 7334, 1993 WL 407902 (Com. Car. Bur.1993); 10 F.C.C.R. 9775, 1995 WL 521362 (1995) (*"EUCL Decisions"*). In rejecting CFC's complaint, the FCC concluded that IPPs were properly considered "end users" and thus could be subjected to EUCL charges. Moreover, the agency held that the IPPs' payphones

were "semi-public" within the meaning of the *Access Charge Reconsideration* no matter where they were located or how they were used.

CFC sought review of the FCC decision in this court and found some success. In *C.F. Communications*, the court vacated the *EUCL Decisions*, holding both that the classification of IPPs as "end users" was an unreasonable interpretation of the relevant regulation, 47 C.F.R. § 69.2(m), and that the FCC had not adequately justified allowing EUCL charges to be collected for IPP phones while exempting similarly situated LEC-owned payphones from such fees. *See* 128 F.3d at 738-42. In deciding this second issue, the court pointedly rejected the FCC's theory that a payphone should be denied "public" (and thus EUCL-exempt) status under the *Access Charge Reconsideration* merely because it was *capable* of private use. Rather, the court stated that the relevant question was how a phone was *actually* used, that is, the manner in which it was held out to the public. *Id.* at 741-42. These holdings were significant because they undermined the legal basis on which the LECs had relied to rationalize their disparate treatment of independently owned "smart" payphones. And, without such support, the LECs' actions seem to collapse into the kind of unreasonable discrimination proscribed by the Communications Act. *See* 47 U.S.C. § 202(a). However, the court in *C.F. Communications* declined to decide "whether the Commission's interpretation compelled LECs to discriminate under Section 202(a), or the precise consequences if it did," leaving those issues for another day. 128 F.3d at 742.

On remand, the FCC chose not to mount a renewed defense of its decision to allow the LECs to assess end-user fees on the IPPs. Instead, the Commission decided to hold the LECs liable for devising and im-

plementing that policy in the first place. In the *Liability Order* now on review, the FCC concluded that, in light of the *C.F. Communications* decision, a EUCL fee imposed on an independent payphone that is used in the same manner as a LEC-owned "public" payphone is an "unreasonable charge" under 47 U.S.C. § 201(b). *See Liability Order* at 8766, ¶ 20. The agency then concluded that an award of damages for such liability was appropriate. *Id.* at 8768-69, ¶¶ 27-29. At the same time, however, the agency postponed a final ruling on damages, reasoning that further briefing and argument were needed in order to fix the proper amount of the award. *Id.* at 8771, ¶¶ 33-34. The LECs filed the present petition for review before that phase of the proceedings commenced.

## II. DISCUSSION

This petition presents two central questions, one jurisdictional and one merits-based. The first is whether the FCC's *Liability Order* is final and therefore subject to immediate judicial review. We answer this question in the affirmative. The second is whether it was permissible for the Commission to hold the LECs liable for imposing charges that had previously been condoned by the FCC itself. We answer this question in the affirmative as well. At the same time, however, we note that, because the agency has not yet conclusively determined how it will measure damages, the LECs still will be able to raise their concerns about retroactivity and reliance with the FCC during the next phase of these proceedings. And, until the Commission reaches a conclusion on that issue, we are unable to review the propriety and permissible extent of damages in this case.

### A. *Finality under 47 U.S.C. § 208(b)*

■ Under 28 U.S.C. § 2342(1) (1994), this court has jurisdiction to determine the validity of "all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." In turn, 47 U.S.C. § 208(b) states that "[a]ny order concluding an investigation" of, *inter alia*, "the lawfulness of a charge" commenced at the behest of a party complaining about the actions of a common carrier "shall be a final order and may be appealed under section 402(a) of this title." The jurisdictional question in this case, then, is whether the *Liability Order* "concluded" the investigation that began with CFC's original 1989 complaint against the LECs.

All parties agree that, in the *Liability Order,* the FCC reached a final determination that the LECs had imposed unreasonable charges in collecting EUCL fees from the IPPs, thereby violating 47 U.S.C. § 201(b). *See Liability Order* at 8773, ¶¶ 40-41. This decision is undoubtedly final, in the sense that there is no indication that the agency will revisit it in future proceedings. Indeed, neither the Commission's brief nor agency counsel's argument on appeal claimed that the finding of liability is subject to further review by the FCC sans a court order requiring it. Nonetheless, the Commission contends that its decision to bifurcate the damages phase of its investigation from the liability phase stripped the entire *Liability Order* of its finality. In other words, according to the FCC, an investigation under § 208 of a single complaint that seeks a determination of liability *and* an award of damages is not over until the Commission has resolved both aspects of the complaint. *See* Br. for Respondents at 27.

■ As a general proposition, an FCC order is final if it "(1) represents a terminal, complete resolution of the case before the agency, and (2) determines rights or obligations, or has some legal consequence." *Capital Network Sys., Inc. v. FCC,* 3 F.3d 1526, 1530 (D.C.Cir.1993) (internal quotations and citations omitted).

Here, we are sure that the *Liability Order*, even without a concomitant determination of damages, has "some legal consequence" for the LECs. The actions of the FCC bear this out. Agency officials have relied on the *Liability Order* at least twice in unrelated cases to deny requests made by SBC Communications, one of the named LECs, to have sanctions against it mitigated. *See In re SBC Communications, Inc.*, 16 F.C.C.R. 10963, 10968, ¶ 15 & n. 38, 2001 WL 618665 (Enf. Bur. rel. May 24, 2001); *In re SBC Communications, Inc.*, 16 F.C.C.R. 5535, 5543, ¶ 19 & n. 53, 2001 WL 253187 (Enf. Bur. rel. Mar. 15, 2001). If the *Liability Order* now furnishes the basis for agency judgments in subsequent cases, the FCC is hard pressed to deny that the finding of legal liability is sufficient to satisfy the second prong of the finality test. *Cf. Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 824 F.2d 1071, 1078 (D.C.Cir. 1987) (holding that an agency designation that "became a part of [the regulated party's] permanent record, thereby exposing [it] to more severe sanctions for later violations" supplied "the 'modicum of injury' necessary to support jurisdiction") (quoting *Meredith Corp. v. FCC*, 809 F.2d 863, 868 (D.C.Cir.1987)).

■ The FCC is, however, quite correct to point out that, under a well-established principle of finality, when a tribunal elects to resolve the issue of liability in a particular action while reserving its determination of damages on that liability, that decision generally is not considered "final" for purposes of judicial review. *See Franklin v. District of Columbia*, 163 F.3d 625, 628 (D.C.Cir.1998) ("In damage and injunction actions, a final judgment in a plaintiff's favor declares not only liability but also the consequences of liability – what, if anything, the defendants must do as a result."); *see also Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (holding that a summary judgment order imposing liability is not considered final under 28 U.S.C. § 1291 where "assessment of damages or awarding of other relief remains to be resolved"). This basic understanding of finality is the norm not only in civil litigation, but also in the administrative context, at least where the relevant statute does not embrace a non-traditional view of finality. *See, e.g., Rivera-Rosario v. United States Dept. of Agric.*, 151 F.3d 34, 37 (1st Cir.1998) ("A final decision in an adjudicatory proceeding is one that resolves not only the claim but, if liability is found, also the relief to be afforded."); *Washington Metro. Area Transit Auth. v. Dir., Office of Workers' Comp. Programs*, 824 F.2d 94 (D.C.Cir.1987); *accord AAA Eng'g & Drafting, Inc. v. Widnall*, 129 F.3d 602, 603 (Fed.Cir.1997) (holding that an order of the Armed Service Board of Contract Appeals was not final because it resolved only "entitlement" (liability) while reserving decision as to "quantum" (damages)).

In this case, however, this norm of finality has been supplanted by statute. Congress added subsection (b) to 47 U.S.C. § 208 in 1988. *See* Pub.L. No. 100-594, § 8(c), 102 Stat. 3021 (1988). This amendment converted what had been § 208 – which allowed a broad group of entities to bring complaints to the FCC challenging the actions of common carriers, thus triggering investigations by the Commission of the "matters complained of" – into what is now subsection (a). In turn, the new provision, subsection (b), established time limits pursuant to which certain investigations cognizable under subsection (a) had to be concluded, and decreed that dispositions in those investigations would be subject to immediate judicial scrutiny. Thus, when the FCC conducts an investigation into the "lawfulness" of a (1) charge, (2) classification, (3) regulation, or (4) practice, "any order concluding" such an investigation is deemed to be a final order under § 208(b).

This case falls squarely within the meaning of this expediting amendment.

■ Our conclusion is compelled by the statutory text. The crucial word in § 208(b) is "lawfulness," which must be read to mean what it says, namely that which is "allowed or permitted by law." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1279 (1993); *cf. Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 826 (D.C.Cir.2001) (Sentelle, J., concurring) ("While it is fashionable in some legal circles to deride 'hyper-technical reliance upon statutory provisions,' this Court does not – and should not – move in them.") (citing *Palm Beach County Canvassing Bd. v. Harris*, 772 So.2d 1220, 1227 (Fla.2000), *vacated*, 531 U.S. 70, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000)). As such, interpreted literally (as we think is proper), § 208(b) applies to final determinations of liability of the sort that the FCC has delivered here.

This conclusion is further buttressed by the fact that § 208(b) does not mention damages. By contrast, damages are specifically covered in three other sections of the chapter: § 206 makes common carriers who do anything "declared to be unlawful" liable for damages; § 207 allows any party harmed by the actions of a common carrier to file a complaint with the FCC seeking damages; and § 209 authorizes the Commission to "make an order directing the carrier to pay to the complainant the sum to which he is entitled" if it determines that damages are appropriate. Given that § 208(b) was designed to render only a limited category of FCC decisions final, the failure of that provision to mention damages, set against the explicit reference to damages in these other provisions, militates in favor of applying § 208(b) as it is written.

It is also noteworthy that § 201(b) declares all "charges, practices, classifications, and regulations" that are "unjust or unreasonable" to be "unlawful." The categories listed in § 201(b) are coterminous with those cognizable under § 208(b), further suggesting that, as to this class of investigations, a determination of lawfulness is separate and distinct from a determination of what damages (if any) should flow from a violation of the law. For, even if the FCC ultimately decides that the LECs need not pay any damages for their EUCL charges, it would not follow from such a decision that they had done nothing unlawful. One can violate the law without being made to pay for it. Accordingly, when the FCC conclusively resolved that the EUCL charges were unreasonable within the meaning of § 201(b) and the *Access Charge Reconsideration, see Liability Order* at 8766, ¶ 20, it simultaneously and necessarily concluded its investigation into the "lawfulness" of those charges, as it left nothing more to be said on the question of whether the LECs had run afoul of the statute's proscriptions.

To the argument that the original "investigation" has not been concluded because CFC's original complaint sought damages, and the agency's failure to determine damages means that it has not resolved all of the "matters complained of" under § 208(a), our answer is simple. The class of investigations contemplated by § 208(b), and subject both to that subsection's time limitations and finality rules, is narrower than the class of investigations contemplated by § 208(a). Indeed, the FCC has conceded as much. *See* Br. for Respondents at 32. This difference in coverage is stark, and plain on the face of the statute. Under § 208(a), investigations can be launched regarding "anything done or omitted to be done by any common carrier subject to this chapter in contravention of the provisions thereof." By contrast, § 208(b) governs only the four types of investigations enumerated above. Its text refers *not* to investigations "of the

matters complained of," but rather to investigations "of the lawfulness of a charge, classification, regulation, or practice."

■ Taken together, then, the language of § 208(b), which speaks only of lawfulness, and the structure of the common carrier chapter, which contemplates separate determinations of lawfulness and damages, compel the conclusion that when the FCC enters an order dealing solely with the lawfulness of a charge, that order is final under § 208(b)(3) even if it fails to resolve a complainant's properly presented claim for damages. Our holding in no way limits how the Commission may elect to investigate complaints under § 208. No FCC order is subject to review under § 208(b)(3) unless it actually *terminates* an investigation of the lawfulness of a common carrier's activities. Thus, had the agency not bifurcated the proceedings in this case, but instead reserved final judgment on the LECs' liability until it was in a position to consider damages simultaneously, this court would have been compelled to wait as well. But, having elected to bifurcate, and thus to render a conclusive finding that the LECs acted unlawfully, the FCC subjected its decision to immediate review. Accordingly, we proceed to the merits of the LECs' petition.

### B. The LECs' Liability for Imposing EUCL Charges

■ The LECs argue that the *Liability Order* was arbitrary and capricious for two related reasons. First, they contend that the Supreme Court's decision in *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), precludes a finding of liability where a common carrier imposes charges pursuant to and in reliance on the Commission's official mandate. Second, they assert that the FCC's change in position amounted to a "new" rule, and, therefore, the agency was foreclosed from applying it retroactively. We reject both claims. In doing so, we emphasize that our analysis here is limited to the question of whether it was permissible for the FCC to hold the LECs liable for violating the Communications Act. We do not decide the question of whether the FCC may award damages for the LECs' charges that have been found to be unlawful.

### 1. The *Arizona Grocery* Rule

In *Arizona Grocery*, the Supreme Court held that the Interstate Commerce Commission could not order a common carrier to pay reparations for charging a rate that the agency had explicitly approved at the time it was collected, but subsequently determined to have been unreasonable. In that case, the ICC had, in a proceeding described by the Court as "quasi-legislative," 284 U.S. at 388-89, 52 S.Ct. 183, ordered railroads shipping sugar from California to Phoenix, Arizona to charge no rate exceeding 96.5 cents per 100 pounds. In response, the carriers adopted a rate of 86.5 cents, which they later reduced to 84 cents; these rates were then challenged before the Commission. In that proceeding, which the Court described as "quasi-judicial," *id.* at 389, 52 S.Ct. 183, the agency determined that this rate was unreasonable to the extent that it exceeded 71 to 73 cents and awarded the sugar shippers reparations from the carriers for the difference. The Supreme Court ultimately held that this damages award was improper:

> Where the Commission has, upon complaint and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, subject a carrier which conformed thereto to the payment of reparation measured

by what the Commission now holds it should have decided in the earlier proceeding to be a reasonable rate.

*Id.* at 390, 52 S.Ct. 183.

Despite the superficial appeal of this passage, the rule enunciated therein is of no help to the LECs in this case. First, *Arizona Grocery* deals only with the power of the ICC to award reparations to shippers for unreasonable rates that they had paid to carriers. *See id.* at 381, 52 S.Ct. 183 ("This case turns upon the power of the Interstate Commerce Commission to award reparations with respect to shipments which moved under rates approved or prescribed by it."). *Arizona Grocery* has been and should be understood in the terms in which it was decided, as a proscription against the retroactive revision of established rates through ex post reparations. *See, e.g., Alabama Power Co. v. ICC,* 852 F.2d 1361, 1373 (D.C.Cir.1988) (suggesting that *Arizona Grocery* stands for the proposition that requiring railroads "to pay refunds, based on a determination that the earlier ·Commission-approved rates were impermissible, runs counter to the well-established prohibition against retroactive ratemaking"); *AT&T v. FCC,* 836 F.2d 1386, 1394-95 (D.C.Cir.1988) (Starr, J., concurring) (citing *Arizona Grocery* for the "basic rule of ratemaking" that "when the Commission determines that existing rates are excessive, it cannot order a refund of past payments under the revoked rate"); *cf. Sea Robin Pipeline Co. v. FERC,* 795 F.2d 182, 189 n. 7 (D.C.Cir. 1986) ("FERC may not order a retroactive refund based on a post hoc determination of the illegality of a filed rate's prescription.").

As such, neither *Arizona Grocery* nor the rule it announced are concerned with a situation such as the one presented here, in which we must decide not whether the FCC may force the LECs to repay that which they took through EUCL charges, but rather whether the Commission may make a retroactive determination that those charges were unlawful at the time that they were imposed. Indeed, the rule against retroactive ratemaking is premised on the implicit understanding that an established rate is not made *illegal* if it is later found to be impermissible or unreasonable. *See, e.g., Arizona Grocery,* 284 U.S. 370, 389, 52 S.Ct. 183, 76 L.Ed. 348 (1932) (the ICC "could repeal the order as it affected future action, and substitute a new rule of conduct as often as occasion might require, but this was obviously the limit of its power, as of that of the legislature itself"); *Town of Norwood, Mass. v. FERC,* 53 F.3d 377, 381 (D.C.Cir.1995) ("The retroactive ratemaking doctrine prohibits the Commission from authorizing or requiring a utility to adjust current rates to make up for past errors in projections. If a utility includes an estimate of certain costs in its rates and subsequently finds out that the estimate was too low, it cannot adjust future rates to recoup past losses."); *Sea Robin,* 795 F.2d at 189 n. 7 ("Sea Robin had a right to rely on the legality of the filed rate once the Commission allowed it to become effective."). The subsequent determination rejecting the earlier rate prescription is similar to a congressional action revising an earlier statutory enactment – the later action may suggest that the original legislative act was ill-advised, but this will not justify reparations for persons who were disadvantaged by the original legislative enactment. This case does not involve the sort of ratemaking contemplated by *Arizona Grocery,* so the same assumptions do not apply here.

Second, in light of the implicit assumptions underlying the rule against retroactive revision of established rates through ex post reparations, it is not surprising that the Court in *Arizona Grocery* observed that the ICC had prescribed a legal rate in its "quasi-legislative capacity." 284

U.S. at 388, 52 S.Ct. 183. The Court recognized that ratemaking – "fixing rates or rate limits for the future" – is a legislative function, and held that once the Commission had exercised such a power it could only undo the results prospectively. *Id.* at 388-89, 52 S.Ct. 183. In other words, *Arizona Grocery,* by its own terms, does not apply where an adjudicating agency alters, even with retroactive effect, a policy established in a previous quasi-judicial action. Nor has it ever been so applied. The lines between these categories of activity are not always clear – indeed, in *Arizona Grocery* itself the quasi-legislative rates were established in an adjudicatory proceeding, *see id.* at 388, 52 S.Ct. 183. Nevertheless, the Court in *Arizona Grocery* made clear that there is an important distinction between rules resulting from quasi-adjudication and rules resulting from quasi-legislation. We are therefore bound to follow the Court's mandate and apply this distinction.

With these principles in mind, we are constrained to conclude that the FCC's actions in this case are not governed by the rule established in *Arizona Grocery.* The *Access Charge Reconsideration,* a rulemaking designed to establish how the LECs were to recover end-user costs in the future, was undoubtedly *legislative* in character. But this rulemaking was not "revised" by the *Liability Order* that the LECs now challenge. Rather, the *Liability Order* merely corrected the *EUCL Decisions,* agency adjudications that had erroneously interpreted the original *Access Charge Reconsideration* by holding that particular instances of challenged conduct on the part of the LECs did not violate the regulations arising from that rulemaking. In those decisions, the FCC did not purport to substitute a new legislative rule for an old one. Moreover, when the court in *C.F. Communications* vacated the judgment in the *EUCL Decisions,* it did so on the grounds that the FCC had miscon-

strued the *Access Charge Reconsideration* rulemaking. *See* 128 F.3d at 741-42. Our opinion in that case did not, however, suggest that the underlying rulemaking was in any way infirm. And on remand, the FCC issued the *Liability Order* to rectify the errors found pursuant to the judicial review of the *EUCL Decisions.*

Therefore, the FCC's actions in issuing the orders in the *EUCL Decisions* and the *Liability Order* were not analogous to the situation in *Arizona Grocery.* In *Arizona Grocery,* the ICC purported to retroactively revise an established rate (that was the product of a "quasi-legislative" action); in this case, by contrast, the FCC purported to interpret and apply legislative regulations in succeeding adjudications.

There is no doubt that the *EUCL Decisions* were intended to have prospective application, in the sense that these adjudicatory actions purported to interpret the *Access Charge Reconsideration* rulemaking, which remained in force all along. But this fact does not advance the LECs' argument. It is well understood that judicial interpretations of legislative enactments have consequences for parties in the future; yet, this does not render the statutory construction a legislative activity. *See Japan Whaling Ass'n v. Am. Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) ("[u]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes . . ."); *Northwest Airlines, Inc. v. Transport Workers Union of Am.,* 451 U.S. 77, 95 & n. 34, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (emphasizing that "the federal lawmaking power is vested in the legislative, not the judicial, branch of government," but that once the legislature speaks, "the task of the federal courts is to interpret and apply statutory law"). So too with adjudication by administrative agencies. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 216-17,

109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring) ("Adjudication ... has future as well as past legal consequences, since the principles announced in an adjudication cannot be departed from in future adjudications without reason."); *Goodman v. FCC*, 182 F.3d 987, 994 (D.C.Cir.1999) ("[T]he nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal."). To suggest, as the LECs do here, that the *EUCL Decisions* were somehow "legislative" merely because they interpreted a rulemaking or because they had some future impact would entirely collapse the distinction between rulemaking and adjudication, and thus the very distinction on which *Arizona Grocery* rests. As such, we hold that when the FCC departed from the *EUCL Decisions* in a subsequent adjudication, it was not constrained by *Arizona Grocery*'s blanket prohibition on retroactive repeals of quasi-legislative ratemaking.

### 2. The Retroactivity Doctrine

This is not to say that agency adjudications that modify or repeal rules established in earlier adjudications may always and without limitation be given retroactive effect. To the contrary, there is a robust doctrinal mechanism for alleviating the hardships that may befall regulated parties who rely on "quasi-judicial" determinations that are altered by subsequent agency action. Over fifty years ago, in *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court cautioned that the ill effects of retroactivity "must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles."

 In the ensuing years, in considering whether to give retroactive application to a new rule, the courts have held that [t]he governing principle is that when there is a "substitution of new law for old law that was reasonably clear," the new rule may justifiably be given prospectively-only effect in order to "protect the settled expectations of those who had relied on the preexisting rule." *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C.Cir.1993). By contrast, retroactive effect is appropriate for "new applications of [existing] law, clarifications, and additions." *Id.* *Pub. Serv. Co. of Colo. v. FERC*, 91 F.3d 1478, 1488 (D.C.Cir.1996) ("*PSCC*"). *See also Aliceville Hydro Assocs. v. FERC*, 800 F.2d 1147, 1152 (D.C.Cir.1986) (discussing the distinction between "new applications of law" and "substitutions of new law for old law"). In a case in which there is a "substitution of new law for old law that was reasonably clear," a decision to deny retroactive effect is uncontroversial. *Epilepsy Found. of N.E. Ohio v. NLRB*, 268 F.3d 1095, slip op. at 12-13 (D.C.Cir. 2001). In cases in which there are "new applications of existing law, clarifications, and additions," the courts start with a presumption in favor of retroactivity. *See, e.g., Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 424 (D.C.Cir.1994). However, retroactivity will be denied "when to apply the new rule to past conduct or to prior events would work a 'manifest injustice.'" *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C.Cir.1987) (en banc) (quoting *Thorpe v. Housing Auth. of the City of Durham*, 393 U.S. 268, 282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)); *see also Consol. Freightways v. NLRB*, 892 F.2d 1052, 1058 (D.C.Cir.1989).

This court has not been entirely consistent in enunciating a standard to determine when to deny retroactive effect in cases involving "new applications of existing law, clarifications, and additions" resulting from adjudicatory actions. In *Clark-Cowlitz*, the *en banc* court adopted a

non-exhaustive five-factor balancing test, *see* 826 F.2d at 1081-86 (citing *Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972)). In a subsequent case, however, we substituted a similar three-factor test. *See Dist. Lodge 64 v. NLRB,* 949 F.2d 441, 447-49 (D.C.Cir.1991) (citing *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106-07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)). And in other cases, the court has jettisoned multi-pronged balancing approaches altogether. *See Cassell v. FCC,* 154 F.3d 478, 486 (D.C.Cir.1998) (declining to "plow laboriously" through the *Clark-Cowlitz* factors, which "boil down to a question of concerns grounded in notions of equity and fairness"); *PSCC,* 91 F.3d at 1490 (concluding that "the apparent lack of detrimental reliance ... is the crucial point supporting retroactivity").

In the present case, the LECs argue that the *Liability Order* should not be given retroactive effect, because it would be grossly unfair to punish them for imposing EUCL charges that were approved, and perhaps even required, by the authoritative pronouncements of the Commission itself. Before addressing these concerns, we note that even if we were to accept the LECs' argument in full, there would still remain a period of approximately four years – from the IPPs' entry into the payphone market in 1984 until the first Thomas letter in 1988 – during which no claim of reliance can possibly be maintained. During this period, the LECs imposed EUCL fees on the IPPs wholly on their own initiative, *i.e.,* without specific guidance from the FCC, and thus entirely at their own risk.

That said, we conclude that the FCC's decision to hold the LECs liable for EUCL charges levied even after the Commission had spoken on the issue was not an abuse of discretion or otherwise impermissible. In reaching this determination, we rely primarily on two factors. The first is the fact that the FCC's policy regarding the propriety of imposing end-user fees on IPPs was never authoritatively articulated outside of the same complaint proceeding in which it was eventually reversed. Indeed, the two *EUCL Decisions,* on which the LECs' reliance argument primarily rests, were part of a single chain of decisions triggered by CFC's original complaint, a chain whose natural progression led to this court, where the Commission's holdings were vacated. Thus, the agency orders on which the LECs claim to have relied not only had never been judicially confirmed, but were under unceasing challenge before progressively higher legal authorities. Our cases indicate that under such circumstances reliance is typically not reasonable, a conclusion that significantly decreases concerns about retroactive application of the rule eventually announced. *See Clark-Cowlitz,* 826 F.2d at 1083 n. 7 ("[A] holding of nonretroactivity ... cannot be premised on a *single,* recent agency decision ... that is still in the throes of litigation when it is overruled.").

Indeed, our holding in *PSCC* is directly on point here. In that case, a group of natural gas producers increased the prices that they charged their pipeline customers in order to recover an *ad valorem* tax imposed by the state of Kansas; the legal theory behind this increase was that this tax was a severance tax under § 110 of the Natural Gas Policy Act. These price hikes were challenged before FERC, which sided with the producers, holding that the Kansas tax came within the meaning of § 110. Reviewing this decision, this court found that FERC's statutory interpretation was unreasonable and reversed. On remand, the Commission retreated from its earlier analysis and found that the tax did not qualify as a severance tax, and therefore that the producers had overcharged the pipelines. We upheld the ret-

roactive application of this decision, in the process rejecting the claims of reliance advanced by the producers, claims that uncannily echo those made by the LECs in the present case. 91 F.3d at 1488-91. The court held that as soon as the pipelines had petitioned the Commission for a ruling that the producers' preferred interpretation of § 110 was incorrect, the producers were put on notice that the recoverability of the tax was "in dispute." Once this challenge had been lodged, it was then unreasonable for the producers to rely on that interpretation, even though it was explicitly endorsed by the agency before ultimately being reversed by this court. *Id.* at 1490. Thus, we concluded that it was appropriate for FERC to hold the producers liable for that which they had taken when the law was uncertain but the Commission was on their side. Just so here. Because the object of the LECs' reliance was neither settled (but rather was perpetually enmeshed in litigation) nor "well-established," *see Clark-Cowlitz,* 826 F.2d at 1083 ("[T]he Commission's ruling in that solitary proceeding can scarcely be viewed as 'well-established.' "), we are skeptical that retroactive liability against the LECs would actually impose a manifest injustice. In light of the ongoing legal challenges to the *EUCL Decisions,* whatever reliance the LECs placed on those rulings was something short of reasonable for purposes of the retroactivity analysis.

The second factor pointing toward retroactive liability is that the agency pronouncements on which the LECs relied were subsequently held by this court to be mistaken as a matter of law. As such, the FCC's *Liability Order* was largely an exercise in error correction. We have previously held that administrative agencies have greater discretion to impose their rulings retroactively when they do so in response to judicial review, that is, when the purpose of retroactive application is to rectify legal mistakes identified by a feder-

al court. *See Exxon Co., USA v. FERC,* 182 F.3d 30, 49-50 (D.C.Cir.1999); *cf. Pub. Utils. Comm'n of the State of Cal. v. FERC,* 988 F.2d 154, 161-63 (D.C.Cir.1993) (noting that the normal rule against retroactive ratemaking may be relaxed where the original order was challenged and determined by this court to be *unlawful*). Indeed, there can be little dispute that had the FCC originally (whether in 1993 or 1995) held in favor of the IPPs, the Commission at that point would have been well within its rights to have held the LECs liable for violating the unreasonable charge provisions of 47 U.S.C. § 201(b). As such, the LECs' argument that the FCC may not reach the same conclusion now reduces to the assertion that the agency may not retroactively correct its own legal mistakes, even when those missteps have been highlighted by the federal judiciary. But this is not the law. *See United Gas Improvement Co. v. Callery Props., Inc.,* 382 U.S. 223, 229, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965) ("An agency, like a court, can undo what is wrongfully done by virtue of its order."); *Natural Gas Clearinghouse v. FERC,* 965 F.2d 1066, 1073 (D.C.Cir.1992) (reading *Callery* to embody the "general principle of agency authority to implement judicial reversals").

In sum, then, the IPPs should not be denied now what they asked for in their original complaint – a determination that the LECs violated the law – merely ·because the FCC bungled their case the first time around. To do so would make a mockery of the error-correcting function of appellate review. It would be to say that the LECs must prevail now because they (wrongfully) prevailed below. We are unwilling to tie the Commission's hands in this way. *Cf. Exxon USA,* 182 F.3d at 49 ("There is also a strong equitable presumption in favor of retroactivity that would make the parties whole."). As such, we conclude that the *Liability Order* rep-

resented a permissible exercise of the FCC's discretion and therefore deny the LECs' petition for review.

██ Having upheld the imposition of retroactive liability, we decline to address whether a similar finding regarding damages would be equally permissible. As described above, the FCC has not yet entered a final order with respect to damages. Both the amount that the LECs will ultimately have to pay, and the time period that those payments will cover, remain for determination. As such, the LECs' contention that equitable restitution, and not legal damages, is the sole remedy available to the IPPs, *see Atlantic Coast Line R.R. Co. v. Florida,* 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935); *Moss v. Civil Aeronautics Bd.,* 521 F.2d 298, 314 (D.C.Cir. 1975), is plainly not ripe for adjudication at this time. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 149-50, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Only after the Commission both commits itself to a method for calculating the proper amount of the award, and concretely applies that method to the LECs, will this court be in a position to evaluate the arguments regarding damages. *See Eagle-Picher Indus., Inc. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985). By bifurcating the proceedings as it did, the FCC left those decisions for another day.

As we read the *Liability Order,* the FCC has suggested a possible means for figuring damages, but has not foreclosed the possibility of modifying that suggestion during the next phase of the proceedings. *See Liability Order* at 8771, ¶¶ 33-34. Specifically, the FCC has not reached a conclusive determination that it will compel the LECs to return all of the monies that they collected in possible reliance on the FCC's official pronouncements. Nor has it rendered a final judgment that the LECs are not entitled to some kind of equitable offset in light of such reliance.

We will not prejudge these issues in advance of the agency.

### III. Conclusion

For the reasons given above, we hold that the *Liability Order* is final despite its failure to reach the issue of damages. Rejecting the LECs' arguments that either the *Arizona Grocery* doctrine or the rule against retroactivity bars the FCC from imposing liability, we deny the petition for review and uphold the Commission's finding that the LECs violated the unreasonable charge provisions of the Communications Act. At the same time, we express no opinion as to whether damages or some other monetary remedy are appropriate in this case, or whether such a remedy, if appropriate, may be imposed retroactively.