# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 12, 2006        Decided May 29, 2007

No. 04-1102

EXXONMOBIL OIL CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

WESTERN REFINING COMPANY, L.P., ET AL.,
INTERVENORS

Consolidated with
04-1103, 04-1104, 04-1140, 04-1142, 04-1143, 04-1160,
05-1204, 05-1217, 05-1218, 05-1219, 05-1223, 05-1226,
05-1232, 05-1245, 05-1303

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Thomas J. Eastment* and *R. Gordon Gooch* argued the cause for Shipper Petitioners. With them on the briefs were *Joshua B. Frank*, *Elisabeth R. Myers*, *George L. Weber*, *Walter Lowry Barfield, III.*, *Steven A. Adducci*, *Richard E. Powers, Jr.*, *Marcus W. Sisk, Jr.*, and *Frederick G. Jauss IV*.

*Charles F. Caldwell* and *Christopher J. Barr* argued the cause for petitioners SFPP, L.P. and the Association of Oil Pipe Lines. With them on the briefs were *Albert S. Tabor, Jr.*, *Catherine O'Harra*, *Sabina K. Dugal*, *Steven H. Brose*, *Timothy M. Walsh*, *Daniel J. Poynor*, and *Michele F. Joy*. *Erin M. Murphy, Neil Patten*, *Judith M. Andrade*, *Kevin B. Bedell*, *Glenn S. Benson*, and *Michael J. Manning* entered appearances.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *R. Hewitt Pate*, Assistant Attorney General, U.S. Department of Justice, *John J. Powers, III.*, and *Robert J. Wiggers*, Attorneys, *John S. Moot*, General Counsel, Federal Energy Regulatory Commission, and *Robert H. Solomon*, Solicitor. *Robert B. Nicholson*, Attorney, U.S. Department of Justice, entered an appearance.

*Charles F. Caldwell* argued the cause for intervenors SFPP, L.P. and the Association of Oil Pipe Lines in support of respondent. With him on the brief were *Christopher J. Barr*, *Albert S. Tabor, Jr.*, *Catherine O'Harra*, *Steven H. Brose*, *Timothy M. Walsh*, and *Daniel J. Poynor*.

*Steven A. Adducci*, *R.Gordon Gooch*, *Elisabeth R. Myers*, *Marcus W. Sisk, Jr.*, *Frederick G. Jauss IV.*, and *George L. Weber* were on the brief of Shipper Intervenors in support of respondent with respect to arguments of SFPP, L.P. and the Association of Oil Pipe Lines.

Before: SENTELLE, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: SFPP, L.P., operates pipelines that transport petroleum products through Arizona, California, Nevada, New Mexico, Oregon, and Texas. This case is the latest chapter in a long-running dispute over SFPP's tariffs.

The consolidated petitions for review challenge three orders of the Federal Energy Regulatory Commission ("FERC"):

1. *ARCO Products Co. v. SFPP, L.P.*, 92 FERC ¶ 61,244 (2000) ("Order Consolidating Proceedings");

2. *ARCO Products Co. v. SFPP, L.P.*, 106 FERC ¶ 61,300 (2004) ("Order on Initial Decision"); and

3. *SFPP, L.P.*, 111 FERC ¶ 61,334 (2005) ("Remand Order").

Several shippers – *i.e.*, firms that pay to transport petroleum products over SFPP's pipelines – seek review of these three orders. The shipper petitioners are BP West Coast Products, Chevron Products, ConocoPhillips, ExxonMobil Oil, Navajo Refining, Ultramar, Valero Marketing and Supply, and Western Refining. The shippers raise several challenges to the Commission's orders. In particular, they argue that: (1) the Commission unlawfully granted an income tax allowance to SFPP; (2) the Commission applied the wrong standard and relied upon faulty data in its analysis of whether SFPP's rates should be "de-grandfathered" under the Energy Policy Act of 1992; and (3) the Commission erroneously held that certain shippers were not entitled to reparations for rates charged on SFPP's East Line after August 1, 2000. SFPP and the Association of Oil Pipe Lines have intervened on behalf of the Commission with respect to these issues.

SFPP and the Association of Oil Pipe Lines have also cross-petitioned for review of the three challenged orders. They argue that the Commission incorrectly interpreted the Energy Policy Act and made several computational errors in determining whether SFPP's rates should be de-grandfathered. The shippers have intervened on behalf of the Commission regarding these issues.

We deny the petitions for review with respect to the income tax allowance issues and the Energy Policy Act issues. We hold that the Commission's income tax allowance policy was not arbitrary or capricious or contrary to law. We also hold that FERC's interpretation of the Energy Policy Act was reasonable. We need not consider several of the arguments raised by SFPP and the shippers regarding FERC's calculations because the parties failed to raise those arguments before the Commission in the first instance. However, we grant the shippers' petition for review with respect to the reparations issue. FERC acted contrary to law when it held that the *Arizona Grocery* doctrine precluded the Commission from awarding reparations to East Line shippers for rates paid after August 1, 2000.

## I. FERC'S INCOME TAX ALLOWANCE POLICY

The first issue in these petitions for review is whether it was lawful for FERC to grant an income tax allowance to pipelines operating as limited partnerships. In the Remand Order, FERC held that SFPP is entitled to an income tax allowance to the extent that its partners incur "actual or potential income tax liability" on the income they receive from the partnership. *SFPP, L.P.,* 111 FERC ¶ 61,334 at 62,456 (2005). The shipper petitioners contend that this order is arbitrary and capricious and contrary to our decision in *BP West Coast Products, LLC v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004), because it grants a tax

allowance to entities that do not actually pay income taxes. While we agree that the orders under review and the policy statement upon which they are based incorporate some of the troubling elements of the phantom tax we disallowed in *BP West Coast*, FERC has justified its new policy with reasoning sufficient to survive our review. We therefore deny the petitions for review with respect to this issue.

## A.

FERC's income tax allowance ("ITA") policy for pipelines that operate as limited partnerships has a tortuous history. In 1995, the Commission adopted the "*Lakehead* policy," under which pipelines' ITA eligibility turned on whether the partners were corporations or individuals. *Lakehead Pipe Line Co.*, 71 FERC ¶ 61,338 at 62,313-15 (1995). In *Lakehead*, FERC held that a pipeline was entitled to an ITA only for income taxes that were "attributable to its corporate partners." *Id.* at 62,314. The Commission reasoned:

> When partnership interests are held by corporations, the partnership is entitled to a tax allowance in its cost-of-service for those corporate interests because the tax cost will be passed on to the corporate owners who must pay corporate income taxes on their allocated share of income directly on their tax returns. The partnership is in essence a division of each of its corporate partners because the partnership functions as a conduit for income tax purposes.

*Id.* at 62,314-15. In contrast, FERC held that pipelines were not entitled to an ITA with respect to income attributable to partnership interests held by individuals because "those individuals do not pay a corporate income tax." *Id.* at 62,315. The Commission noted that its holding "comports with the principle that there should not be an element in the cost-of-

service to cover costs that are not incurred." *Id.*

In the Opinion No. 435 proceedings, FERC applied the *Lakehead* policy to SFPP's rates, holding that SFPP could include an income tax allowance in its cost-of-service for the share of the partnership's income that was attributable to corporate partners. *SFPP, L.P.,* 86 FERC ¶ 61,022 at 61,102-04 (1999). Several parties petitioned for review of this order. The shipper petitioners argued – as they do in the instant case – that SFPP should not be entitled to any income tax allowance because it is a limited partnership that pays no income tax at the entity level. In contrast, SFPP argued that it should have been granted a full income tax allowance, even on the share of income attributable to non-corporate partners.

In *BP West Coast*, we granted the shippers' petition for review and vacated the income tax allowance provisions of Opinion No. 435. 374 F.3d at 1285-93. We held that:

> [T]he Commission's opinions in *Lakehead* do not evidence reasoned decisionmaking for their inclusion in cost of service of corporate tax allowances for corporate unit holders, but denial of individual tax allowances reflecting the liability of individual unit holders.

*Id.* at 1290. In other words, the Commission did not reasonably explain why corporate partners and individual partners were treated differently under the *Lakehead* policy. *Id.* at 1288-90. We acknowledged that corporate income is taxed twice – while other income is taxed only once – but we emphasized that this discrepancy is simply "a product of the corporate form." *Id.* at 1290-91. FERC may not attempt to compensate for the double taxation of corporations by creating a "phantom" tax allowance. As we explained:

> [W]here there is no tax generated by the regulated entity, either standing alone or as part of a consolidated corporate group, the regulator cannot create a phantom tax in order to create an allowance to pass through to the rate payer.

*Id.* at 1291. Income tax costs are "no different" than any other costs, such as bookkeeping expenses. *Id.* We noted that just as a pipeline does not receive an allowance for the bookkeeping costs of its investors, neither may it receive an allowance for income taxes paid by "corporate unit holders" (*i.e.*, investors). *Id.* In sum, our per curiam decision in *BP West Coast* vacated FERC's *Lakehead* policy because the Commission did not provide a reasoned explanation for distinguishing between individual and corporate partners, and because the Commission appeared to be granting income tax allowances to regulated entities that did not actually pay income taxes.

In response to our decision in *BP West Coast*, the Commission issued a notice of inquiry seeking comments from interested parties on the question when, if ever, it is appropriate to provide an income tax allowance for partnerships or similar pass-through entities that hold interests in a regulated public utility. *Inquiry Regarding Income Tax Allowances; Request for Comments*, 69 Fed. Reg. 72,188 (Dec. 13, 2004). On May 4, 2005, the Commission issued a policy statement that provided guidance about how it planned to address the ITA issue going forward. *Policy Statement on Income Tax Allowances*, 111 FERC ¶ 61,139 (2005) ("Policy Statement"). In the Policy Statement, the Commission concluded that "such an allowance should be permitted on all partnership interests, or similar legal interests, if the owner of that interest has an actual or potential income tax liability on the public utility income earned through the interest." *Id.* at 61,736. In response to its request for comments, the Commission received 42 responses. *Id.* at 61,737. After review of the comments, the Commission

determined that it should choose one of four possible approaches:

> (1) provide an income tax allowance only to corporations, but not partnerships; (2) give an income tax allowance to both corporations and partnerships; (3) permit an allowance for partnerships owned only by corporations; and (4) eliminate all income tax allowances and set rates based on a pre-tax rate of return.

*Id.* at 61,741. The Commission ultimately selected the second option, stating that it would "permit an income tax allowance for all entities or individuals owning public utility assets, provided that an entity or individual has an actual or potential income tax liability to be paid on that income from those assets." *Id.* After weighing the relevant policy concerns, FERC concluded that this policy "serves the public because it allows rate recovery of the income tax liability attributable to regulated utility income, facilitates investment in public utility assets, and assures just and reasonable rates." *Id.* at 61,736.

The Commission applied its new policy and reiterated its reasoning in the Remand Order. 111 FERC at 62,454-56. In that order, FERC ruled that SFPP was entitled to an ITA to the extent that the pipeline's partners – both individual and corporate – paid taxes on the income they received from the partnership. *Id.* at 62,455-56. The Commission acknowledged that "the pass-through entity does not itself pay income taxes," but nonetheless granted the ITA because "the owners of a pass-through entity pay income taxes on the utility income generated by the assets they own via the device of the pass-through entity." *Id.* at 62,455. FERC reasoned that:

> [J]ust as a corporation has an actual or potential income tax liability on income from the public utility assets it controls, so do the owners of a partnership or limited liability corporation (LLC) on the assets and income that they control by means of the pass-through entity.

*Id.* Thus, the Commission concluded that "SFPP, L.P. should be afforded an income tax allowance on all of its partnership interests to the extent that the owners of those interests had an actual or potential income tax liability during the periods at issue." *Id.* at 62,456.

ExxonMobil Oil, BP West Coast Products, Navajo Refining Company, and other shippers have petitioned for review of the Remand Order, arguing that FERC's decision to grant SFPP an income tax allowance was arbitrary and capricious and contrary to our decision in *BP West Coast*. The Policy Statement is not directly challenged in these petitions for review. However, in the Remand Order – which is challenged in the instant case – the Commission expressly relied upon the conclusions and reasoning of the Policy Statement. *See* 111 FERC at 62,456 ("Given the Commission's *Policy Statement* and the application of its policy in this opinion, the Commission concludes that SFPP, L.P. should be afforded an income tax allowance . . . ."). Thus, in determining whether the Remand Order was arbitrary and capricious or contrary to *BP West Coast*, we necessarily review the Commission's conclusions and reasoning in the Policy Statement.

**B.**

In the Remand Order, FERC resolved the principal defect of the *Lakehead* policy, which was the inadequately explained differential treatment of the tax liability of individual and corporate partners. The Commission concluded that regulated

pipelines operating as limited partnerships should be eligible for income tax allowances to the extent that *all* partners incur actual or potential tax liability on the income they receive from the partnership. FERC's explanation in support of this policy choice is reasonable, and the Commission's Remand Order is not inconsistent with *BP West Coast.* Accordingly, we deny the petitions for review with respect to this issue.

We review the Commission's ratemaking decisions under the "arbitrary and capricious" standard. *Ass'n of Oil Pipe Lines v. FERC,* 83 F.3d 1424, 1431 (D.C. Cir. 1996) ("*AOPL*"). Under this test, FERC's decisions will be upheld as long as the Commission has examined the relevant data and articulated a rational connection between the facts found and the choice made. *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In other words, the Commission must "cogently explain why it has exercised its discretion in [the] given manner." *Exxon Corp. v. FERC*, 206 F.3d 47, 54 (D.C. Cir. 2000) (internal quotation marks omitted) (alteration in original). In reviewing FERC's orders, we are "particularly deferential to the Commission's expertise" with respect to ratemaking issues. *AOPL*, 83 F.3d at 1431; *see also FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) (noting that a party challenging a natural gas rate order "carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable").

The Commission must ensure that the rates charged by jurisdictional pipelines are "just and reasonable." *BP West Coast*, 374 F.3d at 1286 (citation omitted). We have held that "just and reasonable" rates are "rates yielding sufficient revenue to cover all proper costs, including federal income taxes, plus a specified return on invested capital." *City of Charlottesville v. FERC*, 774 F.2d 1205, 1207 (D.C. Cir. 1985). Of course, this canonical principle of ratemaking begs the question of which

costs are "proper."  In the challenged Remand Order, FERC concluded that it was proper to grant SFPP an income tax allowance to the extent that its partners – both individual and corporate – incurred actual or potential tax liability on their distributive share of the partnership income.  In light of the deference we extend to the Commission's judgments regarding ratemaking issues, we cannot hold that this conclusion was arbitrary or capricious.

On remand from *BP West Coast*, the Commission considered four different options for its income tax allowance policy.  First, the Commission considered – and rejected – a proposal to adopt a modified version of the *Lakehead* policy.  As FERC explained in the Policy Statement, "the Commission agrees with the court's conclusion in *BP West Coast* that . . . *Lakehead* did not articulate a rational ground for concluding that there should be no tax allowance on partnership interests owned by individuals, but that there should be one for partnership interests owned by corporations."  111 FERC at 61,743.  Given our holding in *BP West Coast*, the Commission was certainly permitted – if not required – to reject the comments that proposed a modified *Lakehead* policy.  Second, FERC considered a proposal that would grant income tax allowances only to partnerships that are "owned wholly by corporations filing a consolidated return."  *Id.* at 61,738.  FERC reasonably rejected this for the same reason it rejected the first alternative – because it found no rational reason for differentiating between corporate and non-corporate partnership interests.  *Id.* at 61,744.

The two remaining policy options considered by the Commission were polar opposites.  One proposal would have categorically prohibited limited partnerships from taking income tax allowances, while the other would have granted partnerships a full income tax allowance to the extent that the partners incur actual or potential tax liability.  *Id.* at 61,739-41.  The

Commission chose to adopt a policy of full income tax allowances for limited partnerships, and we cannot conclude that this choice was unreasonable. Most importantly, FERC determined that income taxes paid by partners on their distributive share of the pipeline's income are "just as much a cost of acquiring and operating the assets of that entity as if the utility assets were owned by a corporation." *Id.* at 61,742. In other words, the Commission found no good reason to limit the income tax allowance to corporations, given that "both partners and Subchapter C corporations pay income taxes on their first tier income." *Id.* at 61,744.

Moreover, the Commission determined that income taxes paid on the partners' distributive share of the pipeline's income were properly "attributable" to the regulated entity because such taxes must be paid regardless of whether the partners actually receive a cash distribution. *See United States v. Basye*, 410 U.S. 441, 453 (1973) ("[I]t is axiomatic that each partner must pay taxes on his distributive share of the partnership's income without regard to whether that amount is actually distributed to him."). Based on this aspect of partnership law, FERC concluded that income taxes paid by investors in a limited partnership are "first-tier" taxes that may be allocated to the regulated entity's cost-of-service. The shipper petitioners argue that these taxes are ultimately paid by individual investors – not the pipeline – and thus it was improper for FERC to grant an ITA to the regulated entity. However, the Commission reasonably addressed this concern, explaining:

> Because public utility income of pass-through entities is attributed directly to the owners of such entities and the owners have an actual or potential income tax liability on that income, the Commission concludes that its rationale here does not violate the court's concern that the Commission had created a tax allowance to compensate for

an income tax cost that is not actually paid by the regulated utility.

Policy Statement, 111 FERC at 61,742.

FERC also emphasized that "the return to the owners of pass-through entities will be reduced below that of a corporation investing in the same asset if such entities are not afforded an income tax allowance on their public utility income." *Id.* The Commission determined that "termination of the allowance would clearly act as a disincentive for the use of the partnership format," because it would lower the returns of partnerships vis-a-vis corporations, and because it would prevent certain investors from realizing the benefits of a consolidated income tax return. *Id.* We cannot hold that these conclusions were unreasonable. It has long been established that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Hope Natural Gas*, 320 U.S. at 603. In the Policy Statement, FERC concluded that it would be inequitable to grant a full income tax allowance to corporations while denying a similar allowance to limited partnerships. 111 FERC at 61,740, 61,742. For example, if the corporate tax rate is 35%, then a pipeline that operates as a corporation is permitted to charge a rate of $154 in order to earn after-tax income of $100. As several commenters pointed out, "if an income tax allowance is not allowed the partnership, then the partners must pay a $35 income tax on $100 of utility income, leaving them with only an after-tax return of $65." *Id.* Based on these comments, the Commission determined that pipelines operating as limited partnerships should receive a full income tax allowance in order to maintain parity with pipelines that operate as corporations. This conclusion was not unreasonable, and we defer to FERC's expert judgment about the best way to equalize after-tax returns for partnerships and corporations.

14

In sum, policy choices about ratemaking are the responsibility of the Commission – not this Court. *See AT&T Corp. v. FCC*, 220 F.3d 607, 631 (D.C. Cir. 2000) (noting that "policy judgment[s]" are "for the agency – not this court – to make"). Our role as a reviewing court is limited to ensuring that "the Commission's decisionmaking is reasoned, principled, and based upon the record." *So. Cal. Edison Co. v. FERC*, 443 F.3d 94, 98 (D.C. Cir. 2006) (quoting *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 60 (D.C. Cir. 1999)). Here, the conclusions reached in the Policy Statement and the Remand Order were within the scope of the Commission's discretion with respect to ratemaking issues. We held in *City of Charlottesville* that regulated entities are entitled to recover all "proper" costs from their ratepayers. 774 F.2d at 1207. Obviously, "proper" is not a self-defining term, and the Commission thus has broad discretion to determine which costs may be recovered through a pipeline's rates. Here, FERC has reasonably explained why income taxes paid on partnership income are properly allocated to the regulated entity for ratemaking purposes, and the shipper petitioners have offered no compelling reason to second-guess the agency's policy choices.

\* \* \*

Petitioners argue that regardless of whether FERC's new ITA policy is reasonable, the Remand Order must be set aside because it is inconsistent with our opinion in *BP West Coast*. We disagree.

At the outset, we note that *BP West Coast* did not categorically prohibit the Commission from granting income tax allowances to pipelines that operate as limited partnerships. We granted the shippers' petition for review in that case primarily because of the Commission's inadequately justified differential treatment of individual partners and corporate partners. As we

explained, "the Commission's opinions in *Lakehead* do not evidence reasoned decisionmaking for their inclusion in cost of service of corporate tax allowances for corporate unit holders, but denial of individual tax allowances reflecting the liability of individual unit holders." *BP West Coast*, 374 F.3d at 1290. The Commission has now chosen to treat all income taxes alike, regardless of whether they are incurred by individual partners or corporate partners. *See* Remand Order, 111 FERC at 62,455 (conceding that "*Lakehead* mistakenly focused on who pays the taxes rather than on the more fundamental cost allocation principle of what costs, including tax costs, are attributable to regulated service, and therefore properly included in a regulated cost of service"). *BP West Coast* did not pass upon the specific question at issue in the instant case – whether FERC may grant an ITA to limited partnerships for the income taxes paid by *all* partners on the income they receive from the partnership. It is a basic tenet of administrative law that when an agency action is found to be arbitrary and capricious because of a failure to exercise reasoned decisionmaking, the agency is free to adopt a new policy on remand, provided it supplies a reasoned explanation for its actions. *See SEC v. Chenery Corp.*, 332 U.S. 194, 200-01 (1947) (holding that when a court sets aside an agency order as "unsupportable for the reasons supplied by that agency," the agency is "bound to deal with the problem afresh" on remand).

Petitioners also argue that limited partnerships do not pay entity-level income taxes, and thus FERC's new ITA policy disregards our statement in *BP West Coast* that "the regulator cannot create a phantom tax in order to create an allowance to pass through to the rate payer." 374 F.3d at 1291. While not without force, this argument cannot ultimately prevail, for two reasons. First, as FERC explained in the Policy Statement and the Remand Order, the income taxes for which SFPP will receive an income tax allowance are real, albeit indirect. SFPP

will be eligible for a tax allowance only to the extent it can demonstrate – in a rate proceeding – that its partners incur "actual or potential" income tax liability on their respective shares of the partnership income. Remand Order, 111 FERC at 62,456. Second, when we used the term "phantom tax" in *BP West Coast*, we were reviewing a very different set of orders than the ones at issue here. In *BP West Coast,* we vacated the *Lakehead* policy because the Commission had offered *no* reasoning to support its distinction between corporate partners and individual partners. 374 F.3d at 1290 ("This does not supply reasoning for differentiating between individual and corporate tax liability. It is merely restating the proposition that the Commission is so differentiating."). However, in the instant case FERC has gone to great lengths to explain why the taxes in question are not "phantom" and are properly attributed to the regulated entity. And there is at least one aspect of partnership law that supports FERC's conclusion but was not advanced by the Commission in *BP West Coast* – investors in a limited partnership are required to pay tax on their distributive shares of the partnership income, even if they do not receive a cash distribution. *See Basye*, 410 U.S. at 454. As explained above, this supports FERC's determination that taxes on the income received from a limited partnership should be allocated to the pipeline and included in the regulated entity's cost-of-service. In this sense, petitioners' likening of partnership tax to shareholder dividend tax is inapposite because a shareholder of a corporation is generally taxed on the amount of the cash dividend actually received. In sum, in the Policy Statement and the Remand Order, FERC has reasonably explained why its new ITA policy does not result in the creation of "phantom" tax liability for regulated pipelines that operate as limited partnerships. The same cannot be said for the *Lakehead* policy that we vacated in *BP West Coast*.

Shipper petitioners also emphasize that in *BP West Coast* we rejected SFPP's argument that the Commission should have adopted a full income tax allowance for limited partnerships. Petitioners argue that this holding is now the "law of the case," because the instant case involves the same issue that was litigated – and resolved in the shippers' favor – in the earlier proceeding. Again, we disagree. In *BP West Coast*, SFPP cross-petitioned for review of the *Lakehead* policy. Like the shipper petitioners, SFPP argued that the Commission's distinction between corporate partners and individual partners was unsupportable. 374 F.3d at 1291. However, while the shipper petitioners argued that FERC should not have permitted *any* income tax allowance, SFPP argued that FERC should have granted a *full* ITA to pipelines operating as limited partnerships. We rejected SFPP's argument in *BP West Coast*, but petitioners now read too much into our holding with respect to this issue. All we held in *BP West Coast* is that the Commission was not *required* to grant a full income tax allowance to pipelines that operate as limited partnerships. Petitioners' argument assumes that "not required" is synonymous with "prohibited." To the contrary, when an agency has broad discretion to choose among different policy options, the fact that any one option is not required certainly does not mean that it is prohibited. Arguably, a fair return on equity might have been afforded if FERC had chosen the fourth alternative of computing return on pretax income and providing no tax allowance at all for the pipeline owners. This, however, is a policy decision rejected by FERC. As we noted above, policy decisions are for the Commission and not the court.

\* \* \*

In conclusion, we deny the petitions for review with respect to the income tax allowance issue. Under the arbitrary and capricious test, our standard of review is "only reasonableness,

not perfection." *Kennecott Greens Creek Min. Co. v. MSHA,* 476 F.3d 946, 954 (D.C. Cir. 2007). We need not decide whether the Commission has adopted the best possible policy as long as the agency has acted within the scope of its discretion and reasonably explained its actions. In the Policy Statement and the Remand Order, the Commission resolved the principal defect of the *Lakehead* policy, which was the unexplained differential treatment of individual and corporate partners. FERC then determined that it would be "just and reasonable" to grant regulated pipelines an income tax allowance to the extent that all of the pipeline's partners – whether individual or corporate – incur actual or potential tax liability. The Commission reasonably determined that such taxes are "attributable" to the regulated entity, given that partners must pay tax on their share of the partnership income regardless of whether they actually receive a cash distribution. Additionally, the Commission reasonably relied upon evidence that a full income tax allowance is necessary to ensure that corporations and partnerships of like risk will earn comparable after-tax returns. Lastly, in the income tax allowance Policy Statement, FERC explained in detail why it chose to reject the other three policy options proposed by commenters. We cannot hold that the Commission's policy choices were arbitrary and capricious. Accordingly, we deny the petitions for review with respect to this issue.

## II. ENERGY POLICY ACT ISSUES

Both sets of petitioners argue that FERC misinterpreted § 1803 of the Energy Policy Act of 1992. This provision grandfathers certain oil pipeline rates as they existed at the time of the Act's enactment. Under this statute, shippers can challenge these grandfathered rates when "a substantial change has occurred after the date of the enactment of [the EPAct] . . .

in the economic circumstances of the oil pipeline which were a basis for the rate." FERC interpreted § 1803 to allow rate challenges when there has been a substantial change in a pipeline's overall rate of return. Shipper petitioners argue that this interpretation grandfathers too many rates; they contend that a substantial change in any one cost element, even if offset by other changes such that the overall rate of return is unaffected, subjects a rate to challenge under § 1803. From the other direction, pipeline petitioners contend that FERC's interpretation grandfathers too few rates; they argue that the correct standard should take account of factors in addition to a pipeline's costs. FERC has rejected the diametrically opposed arguments of the petitioners and interpreted the statutory text to establish a middle ground between those two competing positions. We hold that FERC's interpretation is reasonable.

## A.

Federal regulation of oil pipelines began in 1906, when Congress passed the Hepburn Act. That statute applied the Interstate Commerce Act (ICA) to oil pipelines and gave the Interstate Commerce Commission jurisdiction over the pipelines. Pub. L. No. 59-337, § 1, 34 Stat. 584, 584. In 1977, Congress transferred responsibility for oil pipeline regulation to the newly created FERC. Department of Energy Reorganization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565, 584. The following year, Congress comprehensively revised the ICA but provided that its 1977 provisions would continue to govern FERC's regulation of oil pipelines.[1] Act of Oct. 17, 1978, Pub L. No. 95-473, § 4(c), 92 Stat. 1337, 1470.

---

[1] As a result, the older version of the ICA was reprinted in the appendix to Title 49 of the United States Code. Because newer editions of the Code do not include the ICA, however, all citations to the ICA in this opinion refer to the 1988 U.S. Code.

The ICA prohibits pipelines from charging rates that are "unjust or unreasonable" and permits shippers to challenge both pre-existing and newly filed rates. 49 U.S.C. app. §§ 13(1), 15(1), (7). FERC has generally approved just and reasonable rates based primarily on a pipeline's costs. *See Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 776 (D.C. Cir. 2006) (citing *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1428-29 (D.C. Cir. 1996); *Farmers Union Cent. Exch. v. FERC*, 734 F.2d 1486, 1495-96 (D.C. Cir. 1984); *Farmers Union Cent. Exch. v. FERC*, 584 F.2d 408, 412-22 (D.C. Cir. 1978)). In Opinion No. 154-B, issued in 1985, FERC adopted the "trended original cost" (or "TOC") method for ratemaking, in which asset depreciation and equity recovery are smoothed out over the lifetime of a pipeline in order to avoid excessively high rates at the front end, thereby encouraging new market entrants. *See Williams Pipe Line Co.*, 31 FERC ¶ 61,377 at 61,833 (1985); *BP West Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1282-83 (D.C. Cir. 2004).

In 1992, Congress enacted the Energy Policy Act (EPAct). Pub. L. No. 102-486, 106 Stat. 2776. In Title 18 of that Act, called "Oil Pipeline Regulatory Reform," Congress sought to simplify ratemaking procedures for oil pipelines; this would reduce administrative and litigation costs for pipelines and shippers. *See id.* at 3010-12 (codified at 42 U.S.C. § 7172 note); *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1429 (D.C. Cir. 1996). Section 1801 of the EPAct directed FERC to "issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines" within one year of the passage of the Act. 106 Stat. at 3010. Section 1802 required FERC to "issue a final rule to streamline procedures . . . relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays" within 18 months. *Id.* The goal of these provisions was to decrease the costs associated with administrative proceedings and litigation involving oil pipeline rates.

FERC implemented those mandates in Order No. 561 by establishing an indexed cap system, in which the maximum permissible rates for pipelines are adjusted annually to reflect predictions of industry-wide changes in costs.  *See Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, Order No. 561, FERC Stats. & Regs. ¶ 30,985, 58 Fed. Reg. 58,753 (1993); Order No. 561-A, FERC Stats. & Regs. ¶ 31,000, 59 Fed. Reg. 40,243 (1994).  A pipeline may charge a rate above the applicable cap only if there is a "substantial divergence" between the cap and its actual costs, if it shows that it lacks "significant market power," or if all of its customers consent.  18 C.F.R. § 342.4.

We upheld this scheme in *Association of Oil Pipe Lines v. FERC*.  83 F.3d at 1428.  We have explained that the primary benefits of the cap system are that it "dispenses with intricate calculations of specific pipeline costs" and encourages pipelines to develop "cost-reducing innovations" because any given pipeline's cost-cutting is unlikely to affect the industry-wide cap. *Frontier Pipeline Co.*, 452 F.3d at 777.

In keeping with its general purpose to reduce costs from administrative proceedings and litigation associated with the regulation of oil pipelines, the EPAct also includes a "grandfathering" provision that insulates certain pre-existing pipeline rates from challenge even if the rates exceed the appropriate indexed cap.  Section 1803(a) provides that any rate in effect for the full year ending on the date of the enactment of the EPAct (October 24, 1992) is just and reasonable unless it had been subject to protest, investigation, or complaint during that one-year period.  Under § 1803(b), a grandfathered rate can be challenged as not just and reasonable – "de-grandfathered" – if "evidence is presented to the Commission which establishes that a *substantial change* has occurred after the date of the enactment of this Act – (A) in the economic circumstances of

the oil pipeline which were a basis for the rate; or (B) in the nature of the services provided which were a basis for the rate" (emphasis added). Thus, under § 1803, "the analysis of a pipeline rate challenge . . . proceeds in two steps: first, FERC determines whether the rate in question is grandfathered; if it is, FERC then asks whether the rate falls within either of the exceptions outlined in Section 1803(b)." *BP West Coast*, 374 F.3d at 1272.

The background to this litigation is complex. Since the EPAct went into effect in 1992, shippers have asked FERC to declare that SFPP's lines either did not qualify for grandfathering or should be de-grandfathered due to substantially changed circumstances.

*Docket No. OR92-8 (1992-1995).* In Docket No. OR92-8, addressing complaints filed between 1992 and August 1995, FERC determined that SFPP's West Line rates were (with one exception) grandfathered, but that its East Line rates were not. *SFPP, L.P.*, Opinion No. 435-A, 91 FERC ¶ 61,135 at 61,499 (2000); *BP West Coast*, 374 F.3d at 1281. We affirmed FERC's conclusion with respect to the West Line in *BP West Coast Products, LLC v. FERC* (the East Line analysis was not challenged). 374 F.3d at 1278, 1282. In that same docket, FERC also determined that the West Line had not experienced substantially changed circumstances necessary to de-grandfather its rates, despite the fact that FERC's new *Lakehead* policy had altered the income tax allowances SFPP could include in its rates. *See Lakehead Pipe Line Co., L.P.*, 71 FERC ¶ 61,338 (1995); Opinion No. 435-A, 91 FERC at 61,499; *BP West Coast*, 374 F.3d at 1280. In *BP West Coast*, we did not need to reach the question of substantially changed circumstances on the West Line because we held that the *Lakehead* policy itself was defective. 374 F.3d at 1280. We therefore remanded the issue to FERC.

*Docket No. OR96-2 (1995-2000).* While the BP West Coast appeal was pending, FERC consolidated in Docket No. OR96-2 shipper complaints filed between August 1995 and August 2000. In March 2004, three months before we announced our decision in *BP West Coast*, FERC held that the West Line had experienced substantially changed circumstances and thus its rates were de-grandfathered. *ARCO Prods. Co. v. SFPP, L.P.*, 106 FERC ¶ 61,300 at 62,148 (2004) ("Order on Initial Decision"). In the same order, FERC held that SFPP's North and Oregon Lines had not experienced substantially changed circumstances, reversing an ALJ decision to the contrary. *Id.* at 62,153. FERC explained that the ALJ had wrongly found substantially changed circumstances solely because SFPP's tax allowance – only one factor in its total costs – had changed due to the *Lakehead* policy. *Id.* at 62,144. Instead, the Commission explained, the ALJ should have considered whether SFPP's total costs on those lines had substantially changed. *Id.* In other words, even if SFPP's tax liability had significantly decreased, if its overall cost of service remained roughly the same due to other cost increases, there would not be substantially changed circumstances. FERC analyzed the change in total costs on the West, North, and Oregon Lines, and found that only the West Line had experienced substantially changed circumstances. *Id.* at 62,148-50.

*June 2005 Remand Order.* In June 2005, eleven months after our remand order in *BP West Coast*, FERC issued an order that served both as a remand order from *BP West Coast* (addressing Docket No. OR92-8) and as a decision on appeal in Docket No. OR96-2. *SFPP, L.P.*, 111 FERC ¶ 61,334 (2005) ("Remand Order"). In that order, FERC re-calculated whether there had been substantially changed circumstances on SFPP's lines in light of its new adoption of a full income tax allowance policy (see Part I above). After making these calculations,

FERC reaffirmed its determinations that the West Line was de-grandfathered but that the North and Oregon Lines were not. *Id.* at 62,458-59.

Both SFPP (with the Association of Oil Pipe Lines) and its shippers petitioned this Court for review, each believing that the Commission's standard for determining substantially changed circumstances is incorrect. Both sets of petitioners also allege in their petitions that FERC erred in some of its calculations for determining whether SFPP's lines had experienced substantially changed circumstances. We have jurisdiction under 49 U.S.C. app. § 17(10) (1988).

**B.**

Both sets of petitioners challenge FERC's interpretation of the statutory phrase "a substantial change has occurred after the date of the enactment of this Act . . . in the economic circumstances of the oil pipeline which were a basis for the rate." FERC interpreted that phrase to mean a change in a pipeline's total cost of service. Remand Order, 111 FERC at 62,458-59. The shippers believe that the phrase must mean that any substantial change in one rate element – for example, a pipeline's tax allowance – suffices to de-grandfather the rate, even if that change is offset by another change, such that there is virtually no change in the pipeline's overall cost of service. For their part, SFPP and the Association of Oil Pipe Lines believe that the phrase must be interpreted to encompass factors in addition to a pipeline's cost of service because many pipelines did not set the rates initially under the current cost-of-service method. For example, FERC approved some pipeline rates on the basis that a pipeline faced competition sufficient to allow the market, rather than a cost-of-service formula, to determine the rates.

Because Congress authorized FERC to adjudicate complaints arising out of § 1803, the Commission's interpretation of § 1803 in an adjudication is entitled to *Chevron* deference. *BP West Coast*, 374 F.3d at 1272-73.

FERC interprets the phrase "a substantial change has occurred after the date of the enactment of this Act . . . in the economic circumstances of the oil pipeline which were a basis for the rate" as requiring a substantial change in the overall rate of return of the pipeline, rather than in one cost element, such as a tax allowance. That is because, as the Commission explained, "there can be a very large reduction in income tax allowance . . . even if many of the other principal cost factors, and in fact the total cost-of-service, increased." Order on Initial Decision, 106 FERC at 62,144. In other words, it makes little sense to de-grandfather a rate when the pipeline is no more profitable – or perhaps even less profitable – than it was when the rate was grandfathered.

FERC's interpretation easily fits within the bounds of the statutory text. The word "circumstances" plausibly invokes a composite of several variables. One definition of "circumstances" is "the total complex of essential attributes and attendant adjuncts of a fact or action: the sum of essential and environmental characteristics." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 410 (1976). Another is "the logical surroundings or 'adjuncts' of an action; the time, place, manner, cause, occasion, etc., amid which it takes place." 3 OXFORD ENGLISH DICTIONARY 241 (2d ed. 1989). When modified by the word "economic," the word "circumstances" could reasonably mean the total economic outlook of a pipeline – its profitability. In that case, it would be a change only in that overall picture, rather than in any individual part of that picture, that would constitute a change in "economic circumstances." A straightforward reading of the statutory text, therefore,

substantially validates FERC's interpretation.

Moreover, FERC's reading meshes with the purpose of the EPAct, as gleaned from its text and structure. The grandfathering provision of § 1803 is intended to insulate pre-existing rates from attack by ordaining them to be necessarily "just and reasonable." The most natural understanding of § 1803 is that Congress believed that the then-existing rates of return were not so large as to justify the added litigation costs of subjecting the rates to agency evaluation and judicial review. This inference comports with the streamlining goals of § 1801 and § 1802. It makes good sense, then, to de-grandfather rates only when the rate of return itself has changed. It is unclear why Congress would care if the underlying composition of a pipeline's costs has changed so long as the pipeline's rate of return has remained constant or decreased.

The shippers focus on a different word in § 1803: the indefinite article "a" before the phrases "substantial change" and "basis for the rate." They claim that the presence of the singular indefinite article indicates that any substantial change in a single cost element must qualify as a substantial change in economic circumstances, even if that change is offset by other changes such that the pipeline's overall return is unaffected. We disagree that such an interpretation is required by the text. FERC could reasonably conclude that the phrase "a substantial change . . . in the economic circumstances" means a change in the overall economic circumstances, not a change in one economic circumstance. And the phrase "a basis for the rate" indicates nothing more than the fact that there are other bases for a rate besides a pipeline's economic circumstances. The EPAct even identifies another basis for a rate: "the nature of services provided." EPAct, § 1803(b)(1)(B). Neither use of the indefinite article undermines the reasonable inference that the

term "economic circumstances" refers to a composite of several variables rather than any individual variable – which might be the case if, for instance, the statute said "an economic circumstance."

The shippers also contend that the Order on Initial Decision unreasonably departed from FERC's precedent in Opinion No. 435. Of course, FERC may not depart from its own precedent without a reasoned explanation. *See Dominion Res., Inc. v. FERC*, 286 F.3d 586, 592 (D.C. Cir. 2002). In Opinion No. 435, FERC wrote that a substantial change "could be established by one or a number of rate elements" and that it is unnecessary to "establish that there has been a substantial change to every rate design element." 86 FERC ¶ 61,022 at 61,066 (1999). The shippers believe this means that FERC concluded that a change in a single cost element – even absent a change in the overall rate of return – would qualify as a change in economic circumstances. It is doubtful, however, that FERC was considering the possibility that two or more changes could offset each other, which would explain why FERC discussed changes in terms of a single rate element. Nowhere in Opinion No. 435 does FERC mention the possibility of offsetting. In the Order on Initial Decision, in contrast, FERC became aware that using single cost factors "could lead to anomalous results and result [in] a threshold that does not adequately discourage challenges to grandfathered oil pipeline rates." 106 FERC at 62,151. The Commission therefore explained that offsetting changes would not count as changes in economic circumstances. *See* Remand Order, 111 FERC at 62,458-59. This decision does not appear to be a departure from precedent at all, but rather a clarification of an issue that was not on the Commission's radar at the time of Opinion No. 435.

The shippers also argue that FERC inexplicably ascribes a different quantitative level to the word "substantial" in

determining substantially changed circumstances under § 1803 than it does in determining whether a pipeline's costs have increased so much that the pipeline may charge a rate exceeding the appropriate index level. In the de-grandfathering context, the word "substantial" connotes a greater percentage change it does in the indexing context. *See Texaco Refining & Marketing, Inc.*, 103 FERC ¶ 63,055 at 65,151 n.29 (2003); FERC Supplemental Br. at 36-37. Even assuming this argument is not waived (as it is unclear where in the record the petitioners raised this point), it has no merit. The two regulatory contexts that the shippers seek to equate – de-grandfathering and indexing – implicate different regulatory interests. With indexing, FERC must ensure that pipelines can survive economically by recovering their costs. Even a small divergence between the index level and actual costs might thwart this goal. In contrast, in fleshing out the de-grandfathering standard under § 1803, FERC is attempting to determine when a pipeline's costs diverge so much from those of the original rates that the benefits of grandfathering (*e.g.*, less litigation, more certainty) no longer outweigh the costs to consumers. It is hardly irrational to ascribe different meanings to the general term "substantial" in those very different contexts.

Coming from the other direction, SFPP and the Association of Oil Pipe Lines argue that FERC's approach does not provide enough protection to grandfathered rates. They argue that because many of the grandfathered rates were not established using a cost-of-service method, that method was not a "basis" for those rates, and that therefore it is improper to de-grandfather a rate based simply on a change in its cost of service. SFPP points out that "[m]any rates were effectively set according to the informal consent or formal agreement of the shippers." SFPP's Br. at 36. Even rates that were computed through a cost-of-service method often utilized formulas different from the current method – for example, without the

income tax allowance. Moreover, beginning in the late 1980's, FERC offered pipelines a market-based alternative to the cost-of-service method if they could demonstrate that they did not possess significant market power.

A flaw in SFPP's argument, so FERC could reasonably conclude, is that § 1803 does not necessarily depend on the method used to compute the grandfathered rate. Rather, § 1803 *assumes* that the "economic circumstances" of a pipeline were a basis for its rate, regardless of how the rate was actually established. It is certainly reasonable for FERC to use a cost-of-service computation as an approximation for a pipeline's economic circumstances; the purpose of a cost-of-service rate, after all, is to simulate what a pipeline's economic behavior would be in a competitive market. Merely because some grandfathered rates were set according to non-regulated agreements with shippers does not mean that the pipeline's costs did not indirectly influence the rate. Consequently, FERC's choice appears to be a perfectly reasonable means of interpreting and applying § 1803.

## C.

Both the shipper and pipeline petitioners raise a number of technical challenges to the method by which FERC calculated whether SFPP's West, North, and Oregon lines had experienced substantially changed circumstances: (1) The shippers argue that FERC erred in using volumes as a proxy for revenues. (2) The shippers argue that FERC should have apportioned costs among different delivery points on the West Line. (3) The shippers argue that FERC incorrectly determined that SFPP's North and Oregon Lines had not experienced substantially changed circumstances because FERC employed an inappropriate cost-of-service method. (4) SFPP and the Association of Oil Pipe Lines argue that the figure FERC used

for 1992 costs is erroneous. (5) SFPP and the Association of Oil Pipe Lines argue that FERC made an arithmetic error in summing percentages of changes in rate elements to compute the total change in return. Petitioners failed, however, to raise any of those challenges in the proceedings before the Commission.

A party must first raise an issue with an agency before seeking judicial review. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952). This requirement serves at least two purposes. It ensures "simple fairness" to the agency and other affected litigants. It also provides this Court with a record to evaluate complex regulatory issues; after all, the scope of judicial review under the APA would be significantly expanded if courts were to adjudicate administrative action without the benefit of a full airing of the issues before the agency. *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005).

Petitioners believe that the absence of a rehearing requirement in the ICA means that they were not required to raise their complaints with FERC. *Compare* 49 U.S.C. app. § 17(9)(h) (1988) (Interstate Commerce Act) *with* 15 U.S.C. § 717r(b) (Natural Gas Act) *and* 16 U.S.C. § 825*l*(b) (Federal Power Act). Petitioners miss the point: Their error was not failing to seek rehearing, but rather failing to raise the issue at all. *See Sims v. Apfel*, 530 U.S. 103, 108-110 (2000); *L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 36-37; *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *Frontier Pipeline Co.*, 452 F.3d at 793; *cf.* 47 U.S.C. § 405(a) ("The filing of a petition for reconsideration shall not be a condition precedent to judicial review of [an FCC decision] except where the party seeking such review . . . relies on questions of law or fact upon which the Commission . . . has been afforded no opportunity to pass.").

We need not consider the merits of those arguments because none of them was raised below.

**D.**

In sum, we hold that FERC's interpretation of § 1803 as requiring a substantial change in a pipeline's cost of service is a reasonable interpretation of the statute. We need not address the petitioners' challenges to FERC's technical calculations because those arguments were not raised before the Commission.

## III. REPARATIONS

Shipper petitioners also challenge the Commission's denial of their claim for reparations for the service rates they have paid to use SFPP's East Line since August 1, 2000. The ICA permits reparations for successful challenges to the justness and reasonableness of existing rates, *see* 49 U.S.C. app. § 16(3) (1988). If the Commission determines that the pipeline rates are not "just and reasonable," shippers who file complaints – and only those shippers – are entitled to the difference between the rates they paid and the rates the Commission retrospectively determines to be just and reasonable. *Id.* The period for potential reparations generally includes two years prior to the filing date of the complaint. *See id.*; *BP West Coast*, 374 F.3d at 1305-06.

In this case, the Commission determined that reparations were not warranted for the challenged rates that went into effect on August 1, 2000 because (1) they were proposed by SFPP in response to a FERC order, (2) FERC had accepted them (albeit on an interim basis), and (3) at the time the rates were accepted, FERC explicitly recognized shippers' right to appropriate

refunds pending the Commission's finalization of just and reasonable rates. Because reparations are precluded where the Commission has "approved or prescribed" a reasonable rate, *see Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370 (1932), FERC argued that shippers were not entitled to reparations for these rates. In challenging the Commission's ruling, shippers argue, *inter alia*, that *Arizona Grocery* does not apply because the final rate has not been prescribed even as of the time briefs were filed and argument was made to this Court. The Commission and intervenors respond that this Court in *BP West Coast* affirmed an earlier Commission ruling that upon completion of refund calculations, the East Line's rates are considered final and effective as of August 1, 2000; therefore, they argue, *BP West Coast* essentially permits *Arizona Grocery* protection of the final rate once it is determined.

At the outset, we note that in this case the Commission accepted SFPP's proposed rate subject to refund as an interim rate to compensate pipelines before the final just and reasonable rate was to be determined. The question before us is whether we should therefore consider the August 2000 rates minus potential refunds to be FERC-prescribed and thus immune to reparation claims. Critical to our analysis is the fact that when FERC accepted this interim rate, its methodology had not yet been established for determining the final rate. Because we agree with petitioners that the Commission could not have "approved or prescribed" just and reasonable rates as of August 1, 2000, we conclude that these yet-to-be-finalized rates, which the shippers paid to use SFPP's East Line, do not receive *Arizona Grocery* protection. The Commission's ruling in denying these shippers reparations was thus contrary to law.

**A.**

To determine whether the challenged rates were FERC-prescribed, we must review their provenance. SFPP proposed the August 1, 2000 rates in response to a FERC order, which was the result of the proceedings now referred to as the OR92-8 proceedings. We briefly describe the relevant portion of those proceedings.

As we discussed in Part II, § 1803(a) of the EPAct grandfathered any rate in effect for the full year ending on the date of the enactment of the EPAct (October 24, 1992) unless it had been subject to protest, investigation, or complaint during that year. SFPP was unable to benefit from this protection for its East Line rates because one month before passage of the EPAct, a shipper filed a complaint challenging those rates. *See BP West Coast*, 374 F.3d at 1281. Following passage, numerous shippers filed complaints challenging the East Line rates that were not protected by the EPAct.

The Commission grouped those complaints into two dockets: one docket included complaints filed between November 1992 and August 1995 (Docket No. OR92-8) and another docket included complaints filed between August 1995 and August 2000 (Docket No. OR96-2). Although the petition before us challenges only FERC's determination with respect to the complaints in the OR96-2 proceedings, because that determination rested in part on FERC's action with respect to the complaints in the OR92-8 proceedings, we describe each docket in turn. The OR92-8 proceedings involved three steps by which FERC determined that "the East Line rates between Texas and Arizona were not just and reasonable and ordered them to be modified and directed SFPP to make reparations accordingly." Opinion No. 435, 86 FERC ¶ 61,022 at 61,055 (1999) (citing *SFPP, L.P.*, 80 FERC ¶ 63,014 (1997)). Once the

initial determination of unreasonableness had been made, the Commission initiated proceedings to calculate the appropriate modification so that reparations could be paid to East Line shippers that had filed complaints. To calculate the appropriate modification, the Commission employed a "test-year" methodology. *See* 86 FERC at 61,113-14; *see also BP West Coast*, 374 F.3d at 1307 (approving "test-year" methodology). The test year chosen for the OR92-8 proceedings was 1994.[2] The Commission took that rate and, using its indexing regulation,[3] determined just and reasonable rates for the East Line from 1994 through August 1, 2000. *See* Opinion No. 435-B, 96 FERC ¶ 61,281 at 62,071 (2001). The Commission then determined the amount of reparations due shippers that had challenged the East Line rates for these years by calculating the difference between the rates actually paid and the adjusted rates based on the test-year methodology. Finally, SFPP was ordered to pay these reparations to shippers who had filed complaints.[4]

As indicated in Part I, the Commission's order requiring SFPP to pay these reparations did not conclude the OR92-8 proceedings. The shippers that had successfully challenged SFPP's East Line rates also challenged the amount of

---

[2] The ALJ had determined – and the Commission affirmed – that 1994 was a representative year "particularly for throughput." 86 FERC at 61,084-85.

[3] The Commission's indexing regulation permits pipelines to adjust their rates each year based on the Producer Price Index. *See* 18 C.F.R. § 342.3.

[4] Although shippers are entitled to reparations beginning two years prior to the filing date of their complaints, it is not clear from the record whether the Commission indexed the 1994 rates to claims for prior years because the indexing regulations were not in effect prior to 1995. *See* Opinion No. 435-B, 96 FERC at 62,071.

reparations calculated by FERC, arguing that its method of calculating SFPP's cost of service for the test year was amiss. In litigation that came before us in *BP West Coast*, these shippers disputed whether SFPP ought to be allowed to recover (and thus remove from the amount of reparations owed) certain income tax allowances, litigation costs, and reconditioning costs. *See* 374 F.3d at 1285-1302. Because this Court vacated the Commission's *Lakehead* policy and remanded for the Commission to re-calculate just and reasonable rates in light of that holding, *id.* at 1312, FERC had not completed proper calculations when the instant case was heard.

Meanwhile, the Commission had never made a final determination as to SFPP's East Line rates going forward. Instead, the Commission directed SFPP to propose a new tariff for rates beginning on August 1, 2000. *See* Opinion No. 435-A, 91 FERC ¶ 61,135 at 61,521 (2000); Opinion No. 435-B, 96 FERC at 62,075. SFPP proposed such a tariff ("Tariff No. 60"), which was based in large measure on the same calculations that FERC had used to determine just and reasonable rates for 1994 through 2000. 96 FERC at 62,075.

This proposed tariff faced substantial protest from shippers. The Commission also noted that there were "technical problems in SFPP's compliance filings, some of which involved clear overreaching." *SFPP, L.P.*, 100 FERC ¶ 61,353 at 62,626 (2002). So the Commission accepted the rate on an interim basis subject to later refunds if the tariff was subsequently determined not to be just and reasonable.[5] *See id.* at 62,625. The Commission did so "out of equitable concern for the East

---

[5] It is settled that the Commission had authority to direct a pipeline to file interim rates subject to refunds if there was a possibility that the final rates would be lower than the interim rates. *See BP West Coast*, 374 F.3d at 1305.

Line shippers that are not eligible for reparations in this proceeding" because they "would continue to pay rates higher than those that might ultimately be determined to be just and reasonable until such time as a final and definitive prospective rate was determined." *Id.* In other words, because FERC might later deem SFPP's proposed August 2000 rates to be not just and reasonable, the Commission sought to give the benefit of that subsequent determination to East Line shippers who had not filed a complaint challenging these rates. The Commission therefore stressed that SFPP's interim rate for the East Line shippers would not receive *Arizona Grocery* protection because in this case "the Commission has expressly reserved its authority in the context of an ongoing proceeding in which *the methodology for determining the rate had not even been established*." *Id.* at 62,626 (emphasis added).

Since submitting Tariff No. 60 in August 2000, SFPP has changed its rates each year pursuant to the Commission's indexing regulations. *See* Respondent's Br. at 48-49. That is, since August 1, 2000, all East Line shippers have been paying interim rates, and once the final rates are determined all East Line shippers will be entitled to refunds if the interim rates exceed the final rates. As of the time briefs in this matter were filed and argument was presented to this Court, SFPP and the Commission were still working out the implications of *BP West Coast* for the determination of a just and reasonable rate on the East Line. Whatever rate is eventually determined to be just and reasonable will be applied retroactively to August 1, 2000. *See BP West Coast*, 374 F.3d at 1304; Opinion No. 435-B, 96 FERC at 62,079. The shippers seek review of FERC's determination with respect to these rates.

The post-August 1, 2000 rates at issue in this case were not directly challenged in the OR92-8 proceedings. Nevertheless, insofar as these rates applied to all East Line shippers, and

insofar as the complaints filed after August 1995 had still to be addressed, the post-August 1, 2000 rates had important consequences on the calculation of reparations arising from any rate proceedings that ended after August 1, 2000. This brings us to the OR96-2 proceedings, which involved complaints filed between late 1995 and August 2000.[6] The OR96-2 proceedings were initially completed in March 2004, *see* Order on Initial Decision, 106 FERC ¶ 61,300 (2004), then in June 2005, *see* Remand Order, 111 FERC ¶ 61,334 (2005), and were revisited again in December 2005, *see SFPP, L.P.*, 113 FERC ¶ 61,277 (2005). This meant that the East Line's post-August 1, 2000 rates and the Commission's refund policy came under scrutiny to the extent that reparations had to be calculated up until 2006 for the OR96-2 complainants.

In the OR96-2 proceedings, the Commission applied the same test-year methodology it had applied in the OR92-8 proceedings, *see id.*, but substituted 1999 for 1994 as the test year. *See* 113 FERC at 62,096-97. Accordingly, FERC first established the just and reasonable rates based on the estimated cost of service in 1999 and then indexed these rates forward to May 1, 2006. Based on FERC's calculations of the test-year rate, SFPP was directed to make compliance filings with the proposed interim rates by February 15, 2006. *Id.* at 62,115. The

---

[6] Other than the time periods in which they were filed, there is no significant conceptual difference between the complaints in the OR92-8 proceedings and those in the OR96-2 proceedings. The complaints in the first docket challenged the East Line's rates between November 1990 (two years before the first complaint in the docket was filed) and August 2000 (the date Tariff No. 60 went into effect). The complaints in the second docket challenged rates between late 1993 (two years before the first complaint in the docket was filed) and May 2006 (the effective date of SFPP's new tariff), *see SFPP, L.P.*, 114 FERC ¶ 61,136 at 61,463 (2006).

Commission held that SFPP's newly proposed tariff would go into effect as of May 1, 2006. *Id.* As in the OR92-8 proceedings, the tariff was accepted on an interim basis and was subject to refund if the rates are later determined to be not just and reasonable. *Id.* Reparations due shippers for rates paid between 1993 and August 1, 2000 – unless shippers have already received reparations based on the 1994 rates by virtue of having participated in the OR92-8 proceedings – will also be based on the 1999 indexed rates. *Id.* Notably for the current controversy, however, the Commission does not intend to use the 1999 rates to determine the just and reasonable rates between August 1, 2000 and May 1, 2006.

The Commission argues that as a result of the interim rate from SFPP's Tariff No. 60, determined according to the OR92-8 proceedings, all East Line shippers will already receive appropriate refunds once the initial 1994 test-year analysis is corrected and appropriate refunds are ordered. The Commission argues, therefore, that all shippers, including those in the OR96-2 proceedings, will eventually have paid just and reasonable rates on the East Line from August 1, 2000 because the refund will equal the amount between SFPP's proposed interim rate and the final rate eventually calculated by the Commission. Respondent's Br. at 39. For these reasons, in the orders under review, the Commission denied East Line shippers reparations for rates charged for East Line service since August 1, 2000. *See ARCO Prods. Co.*, 92 FERC ¶ 61,244 at 61,781 (2000); Order on Initial Decision, 106 FERC at 62,141; Remand Order, 111 FERC at 62,462-63. Instead, shippers will be entitled to refunds alone. Shippers petition us to vacate FERC's orders thereby entitling them to reparations. Before turning to our analysis of the shippers' petition, we pause briefly to highlight the difference between refund and reparation.

When FERC has accepted interim rates subject to refund, all shippers – not just those that file complaints – are entitled to appropriate refunds once the final "just and reasonable" rates are established. Where the Commission has not prescribed final "just and reasonable" rates, refunds may be appropriate, *e.g.*, where an intervening change in law alters the Commission's cost-of-service calculation. The *BP West Coast* case and the OR92-8 proceedings are illustrative. The Commission used a test-year methodology to calculate just and reasonable rates for a given period, but this Court subsequently held that the Commission, as a matter of law, erred in its income tax allowance policy. *See* 374 F.3d at 1285-93. This Court therefore remanded the case back to the Commission, and the Commission was required to recalculate the underlying rate in light of our holding. Upon completing the calculation, the Commission would then have to index the new just and reasonable rate forward, and order SFPP to refund any amount paid in excess of the new calculations. *See, e.g.*, 113 FERC at 62,115. Reparations, by contrast, correct the errors of rate calculations when those calculations have never been approved as just and reasonable, and only shippers that have filed complaints are entitled to reparations. But under *Arizona Grocery*, where the Commission has prescribed a reasonable rate, it may not then subject a carrier to reparations based on the Commission's revised determination of reasonableness. *See Arizona Grocery*, 284 U.S. at 390.

To those who do not specialize in the Commission's proceedings, it may not be obvious why an East Line shipper that is already entitled to refunds at the completion of compliance proceedings would seek reparations, given that both refunds and reparations amend unreasonable rates by compensating those who have been subject to them by overpayment. The difference to petitioners between refund and reparation is simple: the two methods may, by circumstance

alone, reflect two different values.[7]

## B.

The issue before us is whether *Arizona Grocery* precludes reparations otherwise due East Line shippers for the rates they have paid since August 1, 2000. We are asked to consider, in particular, our holding in *BP West Coast*, which acknowledged the Commission's authority "to direct an oil pipeline to file interim rates to go into effect, subject to refund, during the suspension period for the initial rates." 374 F.3d at 1305. The limited question before us is whether the final rate, which will be determined at the completion of compliance proceedings, is entitled to *Arizona Grocery* protection. Put differently, the question is whether East Line shippers can be considered to have paid FERC–prescribed rates since August 1, 2000 if they receive refunds at the end of yet-to-be concluded compliance

---

[7] In a separate order, the Commission illustrates this possibility:

> By way of example only, assume that the new East Line rate established by this order would be $1.00 on January 1, 1994, and the indexed rate would be $1.10 on August 1, 2000 and $1.20 on May 1, 2006 (the target date of new interim rates in this proceeding). These levels ultimately become the January 1, 1994 indexed final rates adopted by the Commission in this decision for the [OR92-8 Docket]. The projected final rate[s] developed from the 1999 cost of service in [the OR96-2 Docket] are $1.05 as of August 1, 2000 and $1.15 as of May 1, 2006. This latter and lower rate of $1.15 would be effective prospectively on May 1, 2006 because the East Line rates previously established in [the OR92-8 Docket] are subject to the *Arizona Grocery* doctrine.

113 FERC at 62,110.

proceedings. If so, they will not be entitled to reparations. If the disputed rates paid since August 1, 2000 are not FERC-prescribed rates, shippers may seek reparations.

The *Arizona Grocery* doctrine is essentially a prohibition against retroactive ratemaking. The key passage from *Arizona Grocery* states:

> Where the Commission has upon complaint, and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time . . . by declaring its own finding as to reasonableness erroneous, subject a carrier which conformed thereto to the payment of reparation measured by what the Commission now holds it should have decided in the earlier proceeding to be a reasonable rate.

284 U.S. at 390; *see also Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1107 (D.C. Cir. 2001) (noting that *Arizona Grocery* proscribes "the retroactive revision of established rates through ex post reparations"). The purpose of the doctrine is to ensure that when carriers – in this case, pipelines – rely on the Commission's determinations regarding just and reasonable rates, they will not then be forced to pay reparations when the Commission subsequently reconsiders its prior approval. *See Arizona Grocery*, 284 U.S. at 389 ("[T]he carrier is entitled to rely upon the declaration as to what will be a lawful, that is, a reasonable rate[.]"). For this reason, in order for the *Arizona Grocery* doctrine to apply, the Commission must have "approved or prescribed" or "declared" a reasonable rate upon which the carrier has relied. *Id.* at 381, 390.

We hold that where, as here, the Commission accepts a pipeline's proposed tariff subject to suspension and refund without even establishing the methodology for determining the

final rate, the Commission cannot properly be considered to have prescribed a just and reasonable rate until the proposed tariff is approved at the completion of compliance proceedings. Consequently, we hold that *Arizona Grocery* does not preclude reparations in this case. Our holding today is motivated in large measure by the Commission's own acknowledgment that it was uncertain of the methodology it would use to determine a just and reasonable rate when it accepted Tariff No. 60. At the time the shippers moved their gas through the East Line, the Commission had yet to determine either a just and reasonable rate or even the methodology of calculating it. The rates the shippers paid were certainly not settled. The shippers, SFPP, and FERC all accepted the rates to be interim. More importantly, the shippers and SFPP *knew* that FERC had not yet established the methodology it would use to determine a just and reasonable rate for shipments after August 1, 2000. In such a context, the pipeline owner's reliance interest – which *Arizona Grocery* tells us must be protected from retroactive ratemaking – simply does not exist. The fact that once FERC had determined how best to calculate a just and reasonable rate it would apply that methodology retroactively to Tariff No. 60 does not help SFPP. That a rate is ultimately prescribed by FERC is a necessary but not sufficient condition to invoke *Arizona Grocery* protection. To extend *Arizona Grocery* protection to such unsettled rates retroactively would itself amount, potentially, to retroactive ratemaking. Therefore, even after having received refunds, all East Line shippers remain entitled to reparations to the extent that the Commission later determines these rates (less any refunds) to be unjust and unreasonable.

Without any approval, prescription, or declaration of (at a minimum) a definitive methodology by which pipelines are instructed to compute reasonable rates, it is not at all clear in what sense the pipelines can be considered to have *relied* upon

the Commission's determination.  *See Arizona Grocery*, 284 U.S. at 390 (noting that the *Arizona Grocery* doctrine only protects shippers that have "conformed" to FERC-prescribed rates).  Perhaps a reliance argument could be made if the Commission had established a clear guideline for calculating reasonable rates and still accepted SFPP's proposed rates on an interim basis merely because the calculation of the exact rate had not been completed.  But that is not this case and we need not address whether this hypothetical would trigger *Arizona Grocery* protection.  As the record here provides, "it is clear that the Commission had not reached a final determination on the methodology to be used to design SFPP's East Line rates at the time it accepted Tariff No. 60 subject to refund or on the level of those rates."  100 FERC at 62,625.

At oral argument, the Commission argued that the *Arizona Grocery* doctrine was "all about whether people are on notice." Tr. of Oral Arg. at 81.  Thus, the Commission argued that where shipments move under rates the shippers know to be interim, these shipments can still be considered to have moved under the FERC-prescribed just and reasonable rates upon receiving appropriate refunds.  This, we think, is an impermissibly broad reading of *Arizona Grocery* that vitiates its purpose, which is to protect the pipeline's reasonable reliance interest.  We are not aware of any authority that supports such a sweeping application of *Arizona Grocery* urged upon us by the Commission.  By contrast, we have previously cautioned against overly broad interpretation of *Arizona Grocery.  See, e.g.*, *Verizon Tel. Cos.*, 269 F.3d at 1107 ("*Arizona Grocery* has been and should be understood in the terms in which it was decided . . . .").

In support of the Commission's ruling, FERC and intervenors SFPP and the Association of Oil Pipe Lines argue that this Court in *BP West Coast* has already held that SFPP's post-refund rates would be considered final and prescribed

effective August 1, 2000. But this asks too much of our holding in *BP West Coast*. In that case, SFPP challenged the Commission's authority to order refunds to East Line shippers for the interim rates they had been paying since August 1, 2000. We held as regards pre-refund interim rates that "[t]he Commission did not establish final lawful rates where it has expressly reserved authority to make adjustments in the context of an ongoing proceeding *in which the methodology for determining the rate had not even been established*." 374 F.3d at 1305 (emphasis added). We never addressed whether the Commission's final lawful rates would eventually be considered to have been *prescribed* as of August 1, 2000 for purposes of *Arizona Grocery* protection. The issue of whether shippers' claims for reparations would be barred by the Commission's inability to establish the proper methodology to calculate just and reasonable rates until the end of compliance proceedings was not properly before us until today.

Nor are we persuaded by intervenors' argument that "[w]here, as here, FERC orders a carrier to make a compliance filing or file a new tariff to be effective prospectively from the date of the tariff, FERC is prescribing rates." Final Joint Br. of Intervenors SFPP, L.P. and Ass'n of Oil Pipe Lines in Support of Respondent at 14. Such a broad statement is patently inconsistent with the holding of *BP West Coast* because in that case we specifically upheld the Commission's authority to accept a tariff on an interim basis.

In sum, the Commission acted contrary to law when it held that *Arizona Grocery* precluded the Commission from awarding reparations to East Line shippers for rates paid after August 1, 2000. To be sure, for East Line shippers to receive reparations, they will still need to demonstrate that the rates they paid after August 1, 2000 were unjust and unreasonable. Nonetheless, the Commission erred by holding that *Arizona Grocery*

categorically barred it from granting the reparations sought by the shippers. For the foregoing reasons, we vacate the portions of the orders under review in which the Commission disallowed reparations for East Line rates post-August 1, 2000.

## IV.

For the aforementioned reasons, the petitions for review are granted in part and denied in part. We deny the petitions for review with respect to the income tax allowance issues and the Energy Policy Act issues. We grant the petitions for review with respect to the reparations issue, and we remand to the Commission for further proceedings consistent with this opinion.

*So ordered.*